**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**GEORGE E. DORSEY, JR.**
1130 Lewis Ridge Circle
Lawrenceville, GA  30045

    *Plaintiff*

v.

**JULIE SU,**
**ACTING SECRETARY OF LABOR**
U.S. Department of Labor
200 Constitution Avenue, NW
Washington, DC 20210

**Case No.**

Serve:
 Julie Su,
Acting Secretary of Labor
U.S. Department of Labor
200 Constitution Avenue, NW
Washington, DC  20210

Merrick Garland,
Attorney General
Serve on:
Jolene Anne Laurie, Acting Assistant Attorney General for Administration and Deputy
Assistant Attorney General/Controller for the Department of Justice
U.S. Department of Justice, Justice Management Division
959 Pennsylvania Avenue NW, Room 1111
Washington, DC  20530

U.S. Attorney Matthew M. Graves
United States Attorney's Office
601 D. Street NW
Washington, DC  20004

    *Defendant*

## COMPLAINT AND JURY DEMAND

COMES NOW PLAINTIFF, George F. Dorsey, Jr., by and through undersigned counsel, and files this Complaint, and sues the Defendant, and as cause states:

## PARTIES

1.     Plaintiff George F. Dorsey, Jr. resides at 1130 Lewis Ridge Center, Lawrenceville, GA 30045.

2.     Defendant Julie Su, Acting Secretary of the U.S. Department of Labor, maintains a principal address at 200 Constitution Avenue, Washington, DC 20210.

## JURISDICTION AND VENUE

3.     Jurisdiction in this case is based upon 28 U.S.C. §§1331.  Venue in this case is based upon 28 U.S.C. §1343(a)(3), 28 U.S.C. §1343(a)(4) and 28 U.S.C. § 1391, in that this action involves a Defendant that is an officer or employee of the United States, acting in her official capacity or under color of legal authority, or the United States, that is located in this district. In addition, a substantial part of the events or omissions giving rise to the claims in this case occurred within this district.

4.     Plaintiff has timely complied with any conditions precedent and jurisdictional prerequisites to filing suit.

5.     Plaintiff exhausted any and all administrative remedies, including filing a formal complaint of discrimination with the Defendant Department of Labor ("DOL," the "Defendant," or the "Agency"), on February 24, 2021.  The DOL issued Plaintiff a Final

Agency Decision ("FAD") on October 23, 2023.  This Complaint is being filed within 90

days of receipt of the FAD, pursuant to Title VII, 42 U.S. Code § 2000e–16(c).


## FACTS


6.      Plaintiff George E. Dorsey, Jr. ("Plaintiff Dorsey") is currently employed at the

Office of Federal Contract Compliance Programs ("OFCCP") at the DOL, and he has served

at the DOL since August 2010.  From August 2010 until 2012, Plaintiff Dorsey had served as

a Senior Compliance Officer.  In 2012, he was promoted to the position of Director of

Regional Operations, in which capacity he served until 2015.  In 2015, he was promoted to

the position of Deputy Regional Director.  Plaintiff Dorsey has served as Deputy Regional

Director to the present.

7.      Plaintiff Dorsey has excelled in his work with DOL.

8.      From the onset of Plaintiff Dorsey's tenure at the Agency, Plaintiff Dorsey has had a

significant impact on the overall operations of the Agency.

9.      During Plaintiff Dorsey's first few years with the Agency, Plaintiff Dorsey

introduced *prima facie* models for complaint investigations, because the Agency was not

using these models to determine if discrimination had occurred.

10.      In 2014, Plaintiff Dorsey single-handedly worked with opposing counsel to

conciliate a discrimination case against a major American airline, which resulted in $833,000

in back pay and 449 jobs for Black/African American and Hispanic applicants for flight

attendant positions.

11.      In one year alone, in 2017, as the Director of Regional Operations, Plaintiff Dorsey

worked directly with the Southeast's District Directors to conciliate discrimination cases

against: (a) a major security services company, resulting in $200,000 in back wages and 16

job offers; (b) a major corporation, resulting in $86,000 in back wages and seven job offers;

(c) a major sports operation, resulting in $47,000 in back wages and seven job offers; and (d)

another major corporation, resulting in $85,000 in back wages to two complainants.

12.     In order to create enterprise-wide efficiencies, Plaintiff Dorsey also pushed for the

use of SharePoint, based on his practical experience using this tool in the military and private

sector.  The Agency had not yet scaled the use of SharePoint prior to Plaintiff Dorsey's

persistent efforts.

13.     As the Deputy Regional Director, Plaintiff Dorsey filled in for various positions upon

the respective incumbents' departures.   Acting as the Nashville District Director, Plaintiff

Dorsey was able to increase case closures by 500%; and to address several complex

personnel issues, while decreasing delays in compliance review processing.

14.     Acting as the Director of Regional Compliance as an additional duty, Plaintiff

Dorsey effectively transformed the division into a high-performing team.

15.     Among other achievements, Plaintiff Dorsey, by utilizing the latest technology

offered by Microsoft, was able to reduce significantly the costs and time associated with the

review and approval of Outreach and Compliance Assistance event requests.  Plaintiff Dorsey

integrated five MS Applications, including Power Automate, PowerApps, Outlook, Teams,

and SharePoint to automate this process fully from cradle to grave, thereby substantially

saving labor hours and labor costs.

16.     Even while serving in an involuntary detail position that was not consistent with his

career path, Plaintiff Dorsey designed, and helped to lead the development of, two of

OFCCP's first major multi-million-dollar, externally facing platforms, which allow more

than 500,000 federal contractors to verify the existence of their affirmative action plans

("AAPs"), or to upload their AAPs via the Affirmative Action Program Verification Interface

("AAPVI"). Plaintiff Dorsey also contributed significantly to the Agency's second externally

facing platform, which allows these same contractors to submit notifications of contract

awards through the Notification of Construction Contract Award Portal ("NCAP").

17.     Plaintiff Dorsey has historically received Fully Exceeds or Outstanding ratings.

18.     In his thirteen years with DOL, Plaintiff Dorsey had never been subjected to

discipline or counseling.

19.     Nonetheless, neither Plaintiff Dorsey's versatile and superior performance, nor his

dedication to the Agency's mission, sufficed to protect him from discrimination and

retaliation while employed at DOL.

20.     Plaintiff Dorsey is a Black male, and is the only Black male Deputy Regional

Director in the entire Agency.

### Race/Sex Discrimination, Sexual Harassment, and Non-Sexual Harassment at DOL, and Plaintiff Dorsey's Complaints about the Same

21.     During the course of his employment at DOL, Plaintiff Dorsey has observed DOL's

engaging in widespread and systematic discrimination against Black employees and, more

specifically, against Black male employees, including himself.

22.     Plaintiff Dorsey has raised complaints about discrimination against himself and/or

against other Black male employees, including the following:

> a. On September 27, 2018, Plaintiff Dorsey advised Marika Litras, former
>
> Deputy Director at OFCCP (a Caucasian female), of an incident in which Sam
>
> Maiden, a Senior Executive Services ("SES") employee—who is a Caucasian

male—had intentionally blocked the path to Plaintiff Dorsey's office, when Plaintiff Dorsey was attempting to enter his office.  On this same date, Litras was also made aware that, on numerous occasions, Maiden placed his hands in his front pockets and moved his hands around and/or near his pubic area, which Plaintiff Dorsey perceived as fondling himself in front of Plaintiff Dorsey and other staff members.  Litras responded by doing nothing.

b.  Litras was made aware that Maiden imitated the accent of an East Indian SES counterpart, and therefore demonstrated discriminatory animus, during a conference call with Plaintiff Dorsey and another Black male employee on the call.  Plaintiff Dorsey reported Maiden's behavior in the informal EO process and to the National Office, but nothing came of his reporting this.

c.  On June 25, 2020, shortly after the George Floyd murder, Maiden forwarded an email from a White female employee to all Southeast Region staff, with the subject heading "Words of Encouragement," containing a copied quote and a story about a Beatles' song as an "added bonus."  In the email, Maiden included pictures of Paul McCartney and a story about how the song Blackbird was created.  Within the story, were the words "n*gger," "b*tch," and "lynching."  A number of employees complained about this email.  The Agency did nothing.

d.  On June 30, 2020, Plaintiff Dorsey sent an email to the then OFCCP Director, Craig Leen (a Caucasian male) and Deputy Director, Patricia Davidson (a Caucasian female who has represented that she is Hispanic), detailing his accounts of racial hostility toward Plaintiff Dorsey and other Black employees,

while also highlighting the chronic psychological and physiological damage
caused by these occurrences.  Again, the Agency did nothing.

e.  On February 11, 2021, Plaintiff Dorsey sent a 22-page memorandum, with
attachments totaling 505 pages, to the newly arrived Director, Jenny Yang, and
Dariely Rodriguez, Chief of Staff, detailing racial and sexual hostility that he
had experienced while being employed at the Agency; and providing
recommendations on how to improve the organizational culture.  Again, the
Agency did nothing.

f.  A Black male employee sent an email to a higher-level official, the Director of
Management and Administrative Programs ("DMAP"), Kelley Smith, to
complain about a personnel action he perceived as showing favoritism to a
White male employee.  Instead of treating his complaint as a protected
communication/activity, he was issued a Letter of Warning for making his
complaint.

g.  On November 15, 2019, Plaintiff Dorsey informed DOL SES employee, Javaid
Kaiser, an Asian male, of disparaging comments made by National Office staff
in which it was stated that "they don't like George [Plaintiff Dorsey] in the
National Office."

h.  During a discussion about Plaintiff Dorsey's performance evaluation, Maiden
gratuitously brought up an unrelated story about Civil War artifacts and
slavery, and Maiden asserted that slavery was not about states' rights.

i.  On September 21, 2020, Plaintiff Dorsey sent an email, outlining in great detail
the extent to which Kaiser demonstrated racial bias and selective perception by

defending the position of a subordinate White female employee to Plaintiff, overriding Plaintiff Dorsey's view of the matter, without first seeking clarification from Plaintiff Dorsey, and without providing any evidence to justify the override.

## DOL Accepted Biased, Unfounded Complaints against Mr. Dorsey, and Ratified Discrimination against him

23.      The Agency targeted Plaintiff Dorsey based upon specious complaints.

24.      In one such complaint, on September 21, 2017, Summer Jones, an Administrative Officer, named Plaintiff Dorsey as a Responsible Management Official ("RMO") in a harassment complaint based upon Plaintiff Dorsey's requests for a doctor's note for her use of sick leave, a request which Plaintiff Dorsey denied.

25.      Jones also named Maiden as an RMO in this same complaint.

26.      During the beginning and middle of 2017, prior to Jones's filing of her complaint, Plaintiff Dorsey had initiated a suspension action against Jones because of her repeated absences without leave during the year.  There is thus a nexus between Jones's pending discipline and the complaint that she launched against Plaintiff Dorsey.

27.      During the course of the investigation of Jones's complaint, Plaintiff Dorsey was interviewed and/or had to provide affidavits, over six times, while dealing with four different investigators.

28.      Maiden was never interviewed for Jones's complaint, even though he was also named as an RMO.

29.     Two EEO investigations fully exonerated Plaintiff Dorsey, with respect to Jones's claims, as well as with respect to other claims that DOL attempted to attribute to Plaintiff Dorsey involving requests for reasonable accommodation.

30.     More than a year after Jones had filed her complaint, and after she had left the Agency, DOL put forth specious claims against Plaintiff Dorsey regarding matters in which Plaintiff Dorsey had not been involved.

31.     Among other specious claims, DOL alleged that Plaintiff Dorsey had created a SharePoint site to house "medical" information about reasonable accommodation and Family Medical Leave Act (FMLA) requests.  DOL further alleged, again falsely, that Plaintiff Dorsey had violated the Privacy Act, because of the potential disclosure of "medical information," as opposed to Personally Identifiable Information ("PII").  DOL failed to state just what "medical information" had allegedly been disclosed.

32.     DOL also alleged that Plaintiff Dorsey changed the performance ratings of two employees, but failed to name said employees.  Nonetheless, one of these employees, who was known to Plaintiff Dorsey, had her performance rating changed at Maiden's request. Although additional evidence demonstrated Maiden's involvement, DOL wholly attributed this claim to Plaintiff Dorsey, and did not investigate Maiden.

33.     Based upon a complete dearth of evidence, with respect to male employees serving under Plaintiff Dorsey, DOL narrowed its investigations concerning Plaintiff Dorsey to two additional female employees.  In one claim involving these employees, DOL alleged that the employees felt threatened because Plaintiff Dorsey had purportedly "stopped talking" to them.

34.     The EEO Contract Investigator, Dan Pierce, wrote: "The documents received indicated that the Deputy Regional Director Dorsey had little involvement in the two reasonable accommodation requests as these were mostly handled by" a Caucasian female, Assistant District Director, Nashville, Tennessee, and a Hispanic female, Assistant District Director, Miami, Florida.  These two females were not targeted by DOL for discipline.

35.     DOL also alleged that Plaintiff Dorsey "abdicated" his responsibility when he stopped speaking to a direct report for three months, even though email traffic and text messages on Plaintiff Dorsey's personal cell phone, during the period in question, between Plaintiff Dorsey and this employee, clearly show otherwise.

36.     DOL also made the perplexing claim that Plaintiff Dorsey did not respond to a person's emails, which resulted in the person's *ability* to meet deadlines.

37.     In addition, Black female employees, including in management, targeted Plaintiff Dorsey with biased, unsubstantiated complaints, based upon racist tropes.  One such employee, Tina Williams, Director of Policy, in an affidavit dated December 18, 2018, complained that Plaintiff Dorsey's "body language and demeanor could be rather off putting and abrasive."  Williams further characterized Plaintiff Dorsey as a "large gentleman, avid athlete, and bodybuilder," with "a very loud speaking voice."  Williams also made accusations concerning Plaintiff Dorsey's interactions with other employees, but she provided no examples whatsoever.

38.     Based on the above, DOL issued Plaintiff Dorsey a Letter of Counseling, on September 25, 2020.  Other non-Black employees, who were named, who were directly involved, or were otherwise associated, were not the focus of any investigation.  Nor were they issued any counseling or disciplinary documents.

**DOL/OFCCP Weaponized the EEO Program, Refused to Investigate Plaintiff Dorsey's
Complaint of Sexual and Non-Sexual Harassment by his Supervisor, Maiden, and
Retaliated against Plaintiff Dorsey**

39.     Pursuant to 29 C.F.R. § 1614, on July 16, 2018, Plaintiff Dorsey contacted the Civil

Rights Center ("CRC") EEO Counselor to file an EEO Complaint against Maiden for sexual

and non-sexual harassment.

40.     In Plaintiff Dorsey's written submission, entitled "Initial Questions for Complaint of

Discrimination," dated August 10, 2018, Plaintiff Dorsey specifically named eleven

employees as witnesses, in addition to a number of other employees who were either directly

or indirectly involved with Plaintiff Dorsey's claims.  This document was attached with

Plaintiff Dorsey's informal complaint documents.

41.     Plaintiff Dorsey also included descriptions of alleged racial discrimination, as well as

sexual and non-sexual harassment that he experienced between the period of January 2017

and July 12, 2018.

42.     As remedies, Plaintiff Dorsey requested, among other things, a "work environment

free from intimidation and harassing behavior," such as Maiden's "standing in front of me

with his right hand in his pocket," which appeared as if he were "fondling himself."  Plaintiff

Dorsey requested new supervision and a work environment "free from offensive statements."

43.     On August 17, 2018, Plaintiff Dorsey was notified by Betty Lopez, Human

Resources Center ("HRC") EEO Manager, a Black female, that the complaint he filed with

the CRC was forwarded to her for processing and investigation.

44.     On September 6, 2018, the CRC emailed Plaintiff Dorsey a notice to file a formal

complaint.

45.     On September 14, 2018, Plaintiff Dorsey sent an email to the EEO Counselor assigned to his complaint, stating: "I do not plan on vacating my current position."

46.     On September 27, 2018, Plaintiff Dorsey emailed Litras, and detailed Maiden's discriminatory behavior, bullying, and sexual and non-sexual harassment.

47.     In his description of events, Plaintiff Dorsey also made Litras aware of an incident between Jones and Maiden in which Jones sent Plaintiff Dorsey text messages on his personal cell phone in which she described her interaction with Maiden.  In her text messages, Jones wrote: "Sam came screaming at me!!!  And then he must of [sic] felt bad, because he came bank [sic] to my cubicle and was trying to be all nice *back [sic]The folks in the office made sure to stop by and ask if i [sic] was OK.  Because Sam was going off of [sic] me! (Angry emoji added) Anthony, Ade, Kelvin: All dropped by cubicle to make sure I was ok.  Sam went off on me! I was Actually Scared."

48.     Just a few days after Plaintiff Dorsey sent his email to Litras, Litras contacted Plaintiff Dorsey to request that he serve a detail to provide purportedly needed assistance with an information technology project.

49.     When Plaintiff Dorsey informed Litras that he would like to think about it because he was not an information technology professional, Litras's demeanor changed, and she appeared stern in her attempts to persuade Plaintiff Dorsey to accept the detail.

50.     In view of Litras's sharp tone, Plaintiff Dorsey acquiesced to Litras's request and agreed to a 120-day detail, although he was not fully aware of the terms of the detail that Litras was pressuring him to accept.

51.     In this detail, Litras placed Plaintiff Dorsey under Kaiser's supervision, notwithstanding Kaiser's history of engaging in discriminatory conduct.

52.     On October 2, 2018, Litras emailed Kaiser the list of duties that Plaintiff Dorsey was to perform while on the detail.

53.     On October 30, 2018, Litras sent out an Agency-wide email, informing staff that she had asked Plaintiff Dorsey to serve on a full-time, 120-day detail, working closely with Kaiser to help the Agency's National Office launch the AAP-VI project.  Litras asserted that Plaintiff Dorsey's combined experience with IT solutions and OFCCP operations made him "uniquely suited" to assume the detail.  Litras added that she wanted to thank Maiden for supporting this initiative.

54.     Plaintiff Dorsey found this description of his work experience and professional capabilities concerning, because Plaintiff Dorsey had never directly worked with Litras.  Nor had Plaintiff Dorsey submitted a resume or any professional experience information to Litras, which would have enabled her to come to these conclusions about Plaintiff Dorsey's being "uniquely suited" for the detail.

55.     On November 13, 2018, Kaiser emailed Plaintiff Dorsey a list of detail duties in a document entitled "AAP Project Deliverables."  This was the first time that Plaintiff Dorsey learned that he would be a "Product Owner" for the AAP-VI project.

56.     On November 16, 2018, HRC EEO Manager Lopez issued Plaintiff Dorsey a non-acceptance memorandum, stating that she would not investigate Plaintiff Dorsey's claims of sexual harassment and non-sexual harassment against Maiden, because DOL's policy requires that there be a relationship between the alleged misconduct and the complainant's protected characteristics.  Lopez added:  "In this case, you have not demonstrated how the alleged incidents occurred based upon any of the categories protected under the Harassing Conduct Policy."

57.     In response, on November 25, 2018, Plaintiff Dorsey sent an email to Lopez, stating that he had clearly "discussed how [his] race and gender played a role in the treatment he received from Sam Maiden," and Plaintiff Dorsey asked her to provide answers to his response.

58.     Because Plaintiff Dorsey had not heard back from the Agency, or from Lopez, Plaintiff Dorsey followed up with another inquiry, and provided even greater detail with respect to his claims, on July 23, 2019.

59.     On July 28, 2019, Plaintiff Dorsey followed up with Lopez, asking her "why the threshold to initiate an investigation under the DOL's Harassing Conduct Policy was much higher than what the law requires."  Plaintiff Dorsey also inquired why other employees named by Plaintiff Dorsey as witnesses had not been contacted.  Plaintiff Dorsey further asked why one of Lopez's staff members categorized the detail that he was placed in by Litras as "interim relief," given that Plaintiff Dorsey did not agree to this type of interim relief, pursuant to the DOL anti-harassment policy.

60.     In an email dated August 1, 2019, Litras acknowledged to DMAP Smith that she had spoken to Maiden, in order to "learn the other side of the story," after Smith asked Litras if the non-acceptance memorandum issued by Lopez, pertaining to the alleged sexual harassment and non-sexual harassment perpetrated by Maiden, "jarred her memory."  Litras then added that she had "also arranged for George [Plaintiff Dorsey] to be on a detail (for which he was a good project fit) to relieve tension in the SE between Sam and George."  Litras was thereby admitting to a nexus between Plaintiff Dorsey's protected communication/activity and his placement on the detail.

61.     Because of DOL's refusal to investigate Plaintiff Dorsey's claims, Plaintiff Dorsey, on September 19, 2019, sent a letter to Senator David Perdue (GA), in order to push DOL to follow through with its mandated obligation to investigate his complaint.

62.     On the same day, Plaintiff Dorsey forwarded his letter to Leen, in his capacity as OFCCP Director, and to Smith, in her capacity as DMAP Director.

63.     On September 20, 2019, Smith forwarded a copy of Plaintiff Dorsey's letter, sent to Senator Perdue, to Lopez.

64.     In her affidavit dated December 21, 2022, Litras stated that she had approached Plaintiff Dorsey concerning the detail, in part because of his "knowledge, skills, and experience."  She added, however, that "I also recognize that [Plaintiff] George Dorsey's placement in the detail would help relieve tensions in the Southeast Region between George Dorsey, Regional Director Sam Maiden, and other staff."  Litras further stated that "[a]round that time I approached George Dorsey about the detail, he had told me that he did not want to report to Sam Maiden any longer.  The detail gave him this opportunity, and he voluntarily accepted it."

65.     During the beginning stages of this detail, Plaintiff Dorsey learned that he would be filling the role of a non-supervisory position titled "Product Owner," whose only role is to manage the product backlog and to help communicate the vision of the project to internal stakeholders who were associated with the project.

66.     Through reading the contract for this project, Plaintiff Dorsey also learned that the Agency already had in place a federal contractor that provided a Project Manager, Business Analyst, Software Engineer, and Senior Software Engineer to lead the AAP project.

67.     Plaintiff Dorsey also learned that there were two project managers assigned to the AAP project from The Office of the Chief Information Officer ("OCIO").

68.     Plaintiff Dorsey thereupon began to realize he had been downgraded into a much lower level, non-supervisory position when compared to his position as the Deputy Regional Director.  Plaintiff Dorsey further learned that, during this time, the Product Owner role for the Agency's IT project titled "Case Management System" ("CMS") was being filled by a GS-12 employee, whereas Plaintiff Dorsey was a GS-15 at the time.

69.     Kaiser, who was Plaintiff Dorsey's first-line supervisor in the detail and the AAP-VI project's Executive Leader, professed in his affidavit, signed on July 30, 2021, not to know how Plaintiff Dorsey came to be assigned to the detail.  That is, when asked how Plaintiff Dorsey had obtained the detail, Kaiser testified flatly:  "I don't know."  Kaiser further stated:  "Ms. Litras informed me that the Complainant [Plaintiff Dorsey] must be placed on a detail at the national office and she thought the Complainant can help me in the development of the Affirmative Action Verification Initiative (AAVI) web portal."  Kaiser stated further:  "I had no role in this decision.  I was directed to accept this detail."

70.     Plaintiff Dorsey, after learning of the true reasons that he had been placed into the detail, contacted an EEO Counselor and subsequently filed, on May 2, 2022, a formal complaint, alleging retaliation for protected activity.

71.     DOL rejected Plaintiff Dorsey's formal complaint on August 11, 2022, claiming that Plaintiff Dorsey was "dissatisfied with a previously filed complaint."

72.     Plaintiff Dorsey subsequently learned and understood that this was a "catch-all" phrase used by the Agency to dismiss complaints and to forgo its obligation to investigate.

73.     Despite having initially agreed, albeit reluctantly, to a detail for 120 days, the detail was subsequently extended multiple times, over the objections of Plaintiff Dorsey, who subsequently served in the detail for over three years.

74.     Agency records show that no similarly-situated non-Black male has been moved into a detail for complaining about sexual and non-sexual harassment.

**The Agency Continued to Deny Plaintiff Dorsey's Claims with Respect to Sexual Harassment**

75.     On July 24, 2019, Lopez emailed Smith, and minimized Plaintiff Dorsey's claims of sexual harassment and non-sexual harassment.  Lopez discredited Plaintiff Dorsey by lodging such questions as:  "Is this a threat to contact Congress or the press?", "How is he in a hostile environment if he's not there?", "Who are the other employees [who] allegedly experienced and feel the same and shared these concerns with him?  I can't imagine staff confiding in Dorsey."

76.     On July 28, 2019, Plaintiff Dorsey, unaware of Lopez's email of four days before, included Smith on an email to Lopez in which he detailed the sexual and non-sexual harassment that he had suffered, and reiterated the need to have these allegations investigated.

77.     On July 31, 2019, Plaintiff Dorsey provided Smith with a copy of the non-acceptance memorandum in which Lopez refused to investigate Plaintiff Dorsey's claims of sexual and non-sexual harassment by Maiden.

**The Investigation Determined that Maiden Had Violated the DOL's Harassment Policy, and the DOL/OFCCP Issued a Letter of Counseling**

78.     Because of Plaintiff Dorsey's persistent efforts to pursue his claims, Lopez begrudgingly investigated Plaintiff Dorsey's claims of sexual and non-sexual harassment.

79.     As a consequence, on November 22, 2019, Lopez issued a memorandum confirming that Maiden's behavior does not comport with the Agency's policy.

80.     During the investigation, several employees confirmed the sexually harassing behavior that Plaintiff Dorsey had experienced and reported.

81.     One Black female employee wrote:  "Yes, I have witness[ed] Sam all the time with his hands in his front pockets and fondling himself.  He does it all the time.  He puts his hands in his front pockets of his pants and looks to be playing with himself."  She continued:  "He also stares at women's breasts.  He stares at women's breasts, puts his hands in his front pockets, and fondles himself.  Yes, I have reported this to management before."  She further stated:  "My coworker told Sam in a strong voice to move from behind her.  He walked in her cubicle one time and stood behind her.  I, at the time, sat across from her and I looked.  Sam walked back out of her cubicle and stood at the entrance of her cubicle.  Nothing else happened regarding this incident.  I have talked to DRD [Plaintiff] George Dorsey about Sam's behavior.  We talked about his behavior and I asked him, 'do you think he is aware of his actions?'  This was probably last year sometime.  I am not sure what happened.  DRD Dorsey went on a Detail and we didn't even know he was leaving.  Yes, I have reported it to Management before, it's been years ago.  I, along with a coworker (name removed), reported his actions to Marva James, who was the then Deputy Director.  She just said, 'yes, he does stare at your breasts, and he does [seem to] be doing something.'  Again, nothing happened."

82.     A Black male employee stated:  "I have noticed on possibly 3 or 4 occasions where it would appear as if Mr. Maiden would shift himself while talking."

83.     Another Black female employee wrote:  "Yes, I have witnessed hi[s] placing his hands in his pockets multiple times.  I had this discussion with co-workers and have asked them: 'do you think he knows what he is doing?'  Their responses was [sic]: 'hell yeah,' and 'maybe he is just adjusting himself.'"  This employee stated that she and a coworker reported this to James, "when her job title was Deputy Regional Director back in 2008.  I am not really sure what happened after the reporting."

84.     On September 25, 2020, over two years after Plaintiff Dorsey submitted his complaints to Agency officials, in which he alleged sexual and non-sexual harassment, and almost one year after the Agency's EEO office concluded that Maiden's behavior did not comport with the Agency's anti-harassment policy, Maiden was issued a Letter of Counseling for violating the Agency's anti-harassment policy.

85.     In this instance, according to DOL's Table of Disciplinary Offenses and Penalties, at a minimum, Maiden should have received discipline ranging from a 10-day suspension up to removal, for a first offense; a 30-day suspension up to removal for a second offense; and, for a third and/or subsequent offense, removal.

86.     Subsequent to receiving the Letter of Counseling, Maiden left the Agency, but was rehired by DOL and Agency Director, Jenny Yang, on March 14, 2022, as the Regional Director for the Mid-Atlantic Region-OFCCP.

87.     According to Smith's affidavit, dated December 21, 2022, Maiden was issued the Letter of Counseling, not because of the sexual and non-sexual harassment reported by Plaintiff Dorsey and other employees and detailed in the results of the investigative report, but rather because Maiden "failed to act on the many complaints he had received concerning Mr. Dorsey's conduct."

88.     Smith thereby revealed her race and sex bias against Plaintiff Dorsey, and her need to protect Maiden by attributing the issuance of the Letter of Counseling to alleged and unsubstantiated misconduct by Plaintiff Dorsey.

## DOL/OFCCP Extended Plaintiff Dorsey's 120-Day detail for Another 945 Days, Contrary to Plaintiff Dorsey's Wishes or Expectations

89.      After Plaintiff Dorsey had served in the detail for 120 days, Plaintiff Dorsey asked Kaiser when he could return to his position as the Deputy Regional Director.

90.     On June 20, 2019, in an email with the subject heading "Letter to Senator David Perdue," Smith noted that Plaintiff Dorsey's detail was scheduled to end on October 7, 2019.  In the same email, Smith continued by requesting guidance on how to proceed. Smith directed this email to people in management and Human Capital, including Leen, Sydney Rose, and Milton Stewart, who played a role in the selection process for the position of Deputy Director, for which Plaintiff Dorsey applied and was not selected.

91.     On August 19, 2019, Plaintiff Dorsey sent an email to Kaiser, inquiring how long his detail would be involuntarily extended.  In response, Kaiser replied on the same day: "You will be continuing your work until your detail to DPO expires."

92.     On August 22, 2019, Plaintiff Dorsey emailed Crystal Guy, Regional Administrator of the Northeast Region, Office of the Assistant Secretary for Administration and Management ("OASAM"), inquiring whether an employee can opt out of a detail.  On the same day, Guy replied and referred Plaintiff Dorsey to another contact, Connie Jones Pearson.

93.     On August 26, 2019, Plaintiff Dorsey received an email from Cathy Gross of

OASAM, informing him that Charlene Thomas from Labor Relations would reach out to

him regarding his questions relating to an employee's ability to opt out of a detail.

94.     On August 27, 2019, Thomas advised Plaintiff Dorsey to reach out to his local

Labor Management Relations contact for more specific information, because her initial

"research" did not find anything that states that an employee "could not" opt out.

95.     Without Plaintiff Dorsey's knowledge, Kaiser, on August 30, 2019, emailed Craig

Leen, proposing to replace Plaintiff Dorsey on the AAP-VI detail with a GS-12 Caucasian

male.

96.     On November 4, 2019, Plaintiff Dorsey sent an email to Kaiser in which he asked

to discuss the length of his detail per the original email that Litras had sent, setting the

duration of the detail to be 120 days.

97.     On November 5, 2019, Plaintiff Dorsey again emailed Kaiser in order to make

another inquiry concerning how long he was to serve on the detail; and to advise that the

Agency might have contravened U.S. Code 3341; and that Plaintiff Dorsey's "unclassified

duties" might need to be classified after a certain period of time (one year).

98.     On November 6, 2019, former Regional Director, Melissa Spear, sent an email

response to Kaiser concerning Plaintiff Dorsey's concerns by stating:  "We are not running

afoul of US code 3341 because his pay did not decrease and he kept his grade.  I am not

sure about the classification (Candice or Carol will have to respond)."

99.     On November 20, 2019, Kaiser responded to Plaintiff Dorsey's inquiries about the

length of his detail by providing this statement:  "DMAP works with OASAM-HRC to

comply with all statutory and regulatory requirements.  If you have any specific questions

regarding the length of your detail, please contact Carol Qualls….”

### DOL'S Purported Reasons for the Detail Continued to Change Over Time as Part of an Effort to Mask the True Reasons for the Detail

100.     On July 28, 2019, Plaintiff Dorsey was informed by Danielle Alston, from the

Agency's EEO office, that Plaintiff Dorsey's detail was “interim relief,” even though

Plaintiff Dorsey had not agreed to this type of relief, as a result of his having filed a

complaint against Maiden for sexual and non-sexual harassment.

101.     On September 23, 2020, Plaintiff Dorsey learned, for the first time, that the Agency

had framed Plaintiff Dorsey's presence on the detail as a result of an “investigation”

regarding an unsubstantiated harassment complaint from 2017.

102.     On this day, Senator David Perdue's office sent Plaintiff Dorsey a copy of a letter

that was sent to Senator Perdue's office from Sydney Rose, Chief Human Capital Officer.

In her letter to Senator Perdue, Rose repeated the same false justification, made by Lopez,

that Plaintiff Dorsey “did not identify a protected characteristic under Title VII of the Civil

Rights Act,” as a basis for OASAM's EEO Office's refusal to investigate Plaintiff Dorsey's

claims of sexual and non-sexual harassment.  In her second paragraph, Rose stated:  “Mr.

Dorsey was interviewed in two investigations of harassment complaints against him, and he

was detailed to the Office of Federal Contract Compliance Programs (OFCCP) National

Office pending the outcome of these investigations.”

103.     Rose further attempted to discredit Plaintiff Dorsey by misrepresenting both the

timing and the nature of Plaintiff Dorsey's complaint against Maiden.  Rose wrote to

Senator Perdue: “Afterwards, on September 29, 2018, he (Mr. Dorsey) filed a harassment

complaint against his supervisor, Regional Administrator Sam Maiden." Rose continued by alleging falsely that Plaintiff Dorsey "could not recall and did not submit names of witnesses who could corroborate his allegations; and, therefore, Ms. Lopez said the matter was closed."

104.    Rose made still further false statements to Senator Perdue by writing: "At the time, the EEO Office discovered that the matter had been referred only to Ms. Litras, and Human Resources Center (HRC) had no record of receipt." Rose concluded with still another false statement: "Ms. Lopez reported that although the incidents had occurred over four years before, Mr. Maiden's conduct did not comport with the Department's Harassing Conduct Policy."

105.    Since this was the first time that Plaintiff Dorsey had learned that his placement in a detail was predicated upon an investigation which was initiated by Jones in 2017, Plaintiff Dorsey responded to Rose in an email on September 23, 2020.

106.    In his email, Plaintiff Dorsey informed Rose that the information she provided to Senator Perdue was "factually incorrect," and Plaintiff Dorsey requested that Rose contact him to receive the factually correct information. Rose did not respond.

107.    Ultimately, Plaintiff Dorsey served in the detail for more than three years.

108.    On September 21, 2021, Plaintiff Dorsey received an email from Michelle Hodge, informing him that his detail had concluded, effectively returning Plaintiff Dorsey to his rightful position as the Deputy Regional Director of the Southeast Region.

109.    On July 30, 2021, in an affidavit, when asked if he played a role in extending the involuntary detail, Kaiser wrote: "I had no role in decision making through the time of Complainant's (Mr. Dorsey) detail. My impression is that one or more of the following

persons, individually or collectively, made decision [sic] to extend the detail:  Craig Leen,

Agency Head, Jenny Yang, Agency Head from January 20, 2020, Marika Litras, Patricia

Davidson, Melissa Speer, Kelly Smith."  Kaiser added:  "I have no knowledge," when

asked "for what reason(s) was the duration of the detail assignment revised to be in excess

of 120 days?"

110.     On April 1, 2022, in an affidavit, Patricia Davidson (prior Deputy Director for

OFCCP) stated:  "I spoke to Director of DPO, Dr. Kaiser and we determined that Mr.

Dorsey should stay and complete the user portal assignment as well as continue progress on

the NCAP system."  Davidson's statements are clearly in conflict with multiple statements

made by Kaiser regarding the involuntary extension of Plaintiff Dorsey's detail.

111.     On April 25, 2022, an EEO Counselor interviewed Kaiser.  During his interview,

Kaiser stated:  "Litras, his boss, and Deputy Director, at the time, asked him to

accommodate Counselee (Mr. Dorsey) in a detail for a short period of time.  He suggested

at that time that he did not have a place for Counselee (Mr. Dorsey).  He told Litras that it

was a hardship for him to accommodate Counselee (Mr. Dorsey).  He was not given a

reason why Counselee was assigned to detail with him.  However, he later understood that

there was an EEO complaint involved, and that the Agency needed to remove Counselee

from his position for a short period of time.  The detail kept being extended and lasted for

three (3) years.  He was not consulted on the extensions of the detail.  Different people

came in after Litras and kept extending the detail.  He recalled expressing his objections,

including to a political appointee, about the Counselee being detailed with a project, but he

got nowhere." (emphasis added).  Kaiser added:  "Counselee (Mr. Dorsey) did not have any

expertise in the areas required for the project.  He never saw Counselee's (resume); He understood that Counselee had never done this kind of work."

112.    At the conclusion of the investigation involving the claims made in this complaint, Plaintiff Dorsey received a copy of the Report of Investigation ("ROI").

113.    On March 18, 2022, Plaintiff Dorsey learned, from the ROI, that the reason that he had been placed into a detail was not because of his skills, knowledge, or abilities, as previously professed by Litras and Lopez.  According to Kaiser's official affidavit, Kaiser was "directed" by Litras to accept Plaintiff Dorsey as a detailee, and Kaiser was not provided with a reason.  Kaiser wrote in his affidavit:  "Complainant must be placed on detail at the national office and she thought that the Complainant can help me in the development of Affirmative Action Verification Initiative web portal."

114.    Based on this new information derived from the ROI, Plaintiff Dorsey filed his informal complaint of retaliation on April 5, 2022, and his formal complaint on May 2, 2022.

115.    On August 11, 2022, DOL again rejected Plaintiff Dorsey's formal retaliation complaint.

116.    On March 21, 2022, in an affidavit, Litras stated:  "I contacted the complainant about participating in the detail since he had the knowledge, skills, and experience to help with this initiative and offered the voluntary detail assignment to him."  Litras further stated, when asked how Plaintiff Dorsey came to be on the detail, that "[t]he detail was to be in 120- days [sic] with possible extension depending on the status of the project."

117.    Then on December 12, 2022, Litras changed her original statement by adding:  "I also recognized that George Dorsey's placement in the detail would help relieve tensions in

the Southeast Region between George Dorsey, Regional Director Sam Maiden, and other staff. Around the time I approached George Dorsey about the detail, he had told me that he did not want to report to Sam Maiden any longer."

118.    Contrary to Litras's statements, Plaintiff Dorsey had never worked directly with Litras, and Litras could not have known Plaintiff Dorsey's professional background or capability to be involved in an information technology project such as the one he was associated with while on the involuntary detail.

119.    Plaintiff Dorsey never had a conversation with Litras in which he stated, or even suggested, that he wanted to leave his position as the Deputy Regional Director; because, generally, during EEO investigations, the alleged perpetrator is removed from the workplace, not the victim.

120.    Plaintiff Dorsey also communicated his desire not to leave his position through the informal and formal EEO processes.

### DOL/OFCCP Targeted Plaintiff Dorsey with Severe Administrative Action for Unsubstantiated Harassment Claims.

121.    On June 17, 2019, EEO Investigator James Corvino concluded his investigation into alleged violations of Agency policy and/or law pertaining to the processing of reasonable accommodation requests, and pertaining to alleged contact with a physician.

122.    Within his report, Corvino listed, as Responsible Management Officials, a White female Assistant District Director and a Hispanic female Assistant District Director. Plaintiff Dorsey was listed as a witness.

123.     Corvina concluded: "Mr. Dorsey had little involvement in the two reasonable accommodation requests," in that these were primarily handled by the White female Assistant District Director and the Hispanic female District Director.

124.     On June 19, 2019, Corvino formally concluded his investigation into allegations of harassing conduct. He made no determination concerning whether Plaintiff Dorsey violated the Agency's anti-harassment policy, nor did any evidence prove such.

125.     On August 19, 2019, Lopez issued a memorandum, summarizing the results of these two investigations, and offering her recommendations.

126.     In her summary, Lopez offered a tendentious, one-sided synopsis, which was void of any explanations, evidence, or statements provided by Plaintiff Dorsey during this two-year process.

127.     In her attempt to comprise issues against Plaintiff Dorsey, Lopez stated that a White male Compliance Officer and Black male Compliance Officer made similar allegations that Plaintiff Dorsey harassed them based on sex and disability.

128.     In her memorandum, Lopez did not name the two non-Black male responsible management officials who, according to the EEO investigative reports concerning this matter, were directly responsible for processing reasonable accommodation requests for these two employees. In addition, neither of these two investigative reports contained any affidavits or statements supporting Lopez's written statements.

129.     Lopez wrote that the "investigation revealed a systemic violation of the Privacy Act, 5 USC 552a, confidentiality under the Rehab Act concerning employees' medical conditions and records."

130.     Lopez made up her own interpretation of the results, an interpretation that was contrary to both investigations, when she wrote:  "Mr. Dorsey routinely inserted himself and obstructed the accommodation process, even when he was not the requesting employee's first-or second-level supervisor and those managers often did not object to the accommodation.  To ensure his involvement, the investigation revealed that Mr. Dorsey used a shared directory, which is accessible to all OFCCP managers in the Southeast Region, to establish an unauthorized system of records (also in violation of the Privacy Act) to record information about accommodation requests.  Specifically, the directory was used to upload and store copies of incoming requests (Confirmation of Request for Reasonable Accommodation forms) and the Agency decision memos."

131.     Lopez ended her memorandum by concluding that "the information was insufficient to reach a final conclusion under the Policy."  She also attempted to attribute Southeast Region employee feedback from a 2018 and 2019 Federal Employee Viewpoint Survey ("FEVS") to Plaintiff Dorsey; even though the dates in question were periods in which Plaintiff Dorsey was on the involuntary detail in which he was reporting to the National Office.

132.     Lopez recommended that the Agency "permanently reassign" Plaintiff Dorsey to "another area or position."

133.     After receiving this memorandum, DOL, through Smith and Carol Qualls, HR Branch Chief, furthered the Agency's attempt to target Plaintiff Dorsey.

134.     On January 17, 2020, in an email, Smith explained to Amy Sandifer that Qualls provided comments and asked that the proposed administrative action against Plaintiff Dorsey be "beefed up."

135.     On January 21, 2020, Sandifer pushed to have Kaiser appointed as the deciding official on a proposed administrative action against Plaintiff Dorsey, but ultimately decided that Maiden, against whom Plaintiff Dorsey had filed a sexual and non-sexual harassment complaint, should be the deciding official.

136.     On May 5, 2020, DOL proposed that Plaintiff Dorsey receive a demotion and a reprimand.  DOL also contacted Maiden in order to get more supporting evidence to move forward with the proposed demotion.

137.     Ultimately, Plaintiff Dorsey was issued a Letter of Counseling by Smith on September 28, 2020, not because Plaintiff Dorsey was found to have violated department policies, but because allegations were lodged against him.

Agency records provided show that no non-Black male employee has been issued a Letter of Counseling for unsubstantiated and frivolous claims, claims that have caused additional harm to Plaintiff Dorsey's reputation, emotional and mental well-being, and, ultimately, his career.

**DOL/OFCCP Disqualified All Nine Qualified Black Male Applicants, Including Plaintiff Dorsey, for the Position of Director of Management and Administrative Programs ("DMAP")**

138.     On March 21, 2019, DOL updated the position description for the Director of Management and Administrative Programs ("DMAP") position, which is an SES level position.

139.     On May 9, 2019, the DMAP position was posted on USAJOBS with a vacancy announcement closing date of June 10, 2019.

140.     On May 15, 2019, the DMAP position was re-posted on USAJOBS, with a vacancy announcement closing date of June 15, 2019, with the statement:  "new link and extended closing date."

141.    On May 24, 2019, Litras sent an Agency-wide email, thanking Candice Spalding, a Caucasian female, for acting as the DMAP Director for 120 days.  Litras added that "Effective Tuesday, May 28, Ken Leung [an Asian male] will serve as the Acting DMAP Director for the next 120 days."

142.    On June 7, 2019, an email was sent out Agency-wide, showing the DMAP position open with a closing date of June 15, 2019.

143.    On June 13, 2019, the DMAP position was reposted again with a vacancy announcement closing date of June 24, 2019.

144.    Plaintiff Dorsey applied for the DMAP position on June 24, 2019.

145.    Out of the 47 applicants for the DMAP position, the following applicants listed in the table were interviewed.

| Race/Gender | % of total applicants | # interviewed | % interviewed | % of total applicants |
|---|---|---|---|---|
| Black male | 9 | 0 | 0% | 19% |
| Black female | 14 | 8 | 57% | 30% |
| White male | 10 | 2 | 20% | 21% |
| White female | 6 | 3 | 50% | 13% |
| Hispanic male | 2 | 1 | 50% | 4% |
| Hispanic female | 3 | 2 | 66% | 6% |
| Asian male | 3 | 2 | 66% | 6% |

146.    The interview panel for the DMAP position consisted of Maiden, Litras, Joel Lovelace, and Leen.

147.    On June 25, 2019, at 0917 hours, Plaintiff Dorsey sent an email to the DMAP vacancy announcement contact, John Sylvia, explaining that the application system kicked him out five minutes after he selected "ok" for more time.  Plaintiff Dorsey also explained that the application system did not wholly save his responses to the Executive Core Qualifications ("ECQ"), so he had to rewrite at least 50% of what he had previously written.  Plaintiff Dorsey recommended that "there should at least be a save button or guidance directing applicants to either write and save their work in another location or enter some dummy text in all the boxes and then click next to save what has been written."

148.    On June 25, 2019, at 1335 hours, Plaintiff Dorsey's application status was changed from "NEW" to "AR [Application Received]."

149.    On June 25, 2019, at 1422 hours, Tania Burkley, Talent Acquisition Branch Chief, requested DMAP applications from the application system for vacancy resume type "Accept USAJOBS resume builder resume only."

150.    On June 26, 2019, Plaintiff Dorsey received a notification from USAJOBS, informing him that an update had been made on his application status.

151.    On July 24, 2019, at 0912 hours, the vacancy announcement contact, Sylvia, requested the applications for four DMAP applicants: two Black females (including Ms. Smith-Internal), one Asian Male (Internal), and one White female (Internal).

152.    Organizationally, Sylvia reports to Ms. Burkley, as well as to Demeatric Gamble, Chief, Division of Executive Resources.

153.    On September 12, 2019, at 1212 hours, Plaintiff Dorsey's application status was changed from "AR" to "NQ [not qualified]."

154.     On September 13, 2019, at 0119 hours, Plaintiff Dorsey received a notification from USAJOBS, informing him of an update to his application status.

155.     On October 18, 2019, Plaintiff Dorsey sent an email to Sylvia, inquiring why his application status had been changed from "Referred" to "Not Referred."

156.     On October 21, 2019, Sylvia responded to Plaintiff Dorsey's inquiry by stating that his "application status was not referred.  If the status appeared as Referred this was completed in error."

157.     On July 21, 2021, Sylvia stated, in his affidavit, that Plaintiff Dorsey's application was rated as not qualified, based on insufficient responses to the ECQ/MTQ questions. Sylvia did not define "insufficient."

158.     As evidence, Sylvia provided an undated and unsigned internal document titled "QUALIFICATION SHEET," which displays a check mark in the box MTQ, but not for boxes indicating ECQ or both.

159.     On November 30, 2022, during his deposition, Sylvia defined the word "insufficient" by stating that Plaintiff Dorsey had only provided "two or three" lines for "one or for probably at least two of the narratives."

160.     Also during his deposition, Sylvia agreed that there was no minimum character requirement for responses for MTQs or ECQs.

161.     Not all applicants for the DMAP position were subjected to the same level of scrutiny by DOL.

162.     In the DMAP posting, there is a requirement that each executive core qualification and mandatory technical qualification be addressed separately.  Each ECQ should contain at least two examples describing the applicant's experiences and accomplishments/results.  In

answering ECQ/MTQ questions, applicants may not use the same answer for different ECQs/MTQs.

163.   A White male GS-14 applicant provided the same answer to MTQs 8 and 9, and was deemed minimally qualified and selected for an interview.

164.   In the DMAP vacancy announcement, there is a requirement that each ECQ/MTQ be answered by the applicant, describing said applicant's own experiences and said applicant's own accomplishments and results.

165.   A White female applicant provided a response akin to a job description for ECQ 4 and did not give examples of her own experiences, accomplishments, and results.

166.   On December 5, 2022, during his deposition, Gamble stated that the White female applicant's response "[r]eads pretty similar to a job description."

167.   This White female applicant was nonetheless deemed minimally qualified and selected for an interview.

168.   To allow for a current Agency employee, who was a White male GS-14, to apply and interview for the DMAP position, DOL adjusted the minimum qualifications for the position to read:  "You must have one year of specialized experience at a level close to the work of this job," while not specifically defining "at a level close."

169.   As specified in the DMAP vacancy announcement, the incumbent must have one year of experience as an expert in the areas of organizational and human resources planning, administrative operations, communications and information technology, employee and labor management relations, and budget management.

170.   A Black female employee did not have any experience that would deem her an "expert" in employee and labor management relations, budget management, or

organizational and human resources planning.  Nonetheless, this applicant was deemed minimally qualified, was selected for an interview, and was hired into the DMAP position.

**DOL/OFCCP Hired an Unqualified Black Female, Kelly Smith, into the DMAP Position, while Rejecting Plaintiff Dorsey, a Substantially More Qualified Black Male Applicant**

171.    DOL strategically implemented specific personnel actions in order to align Smith, a Black female, to fill the DMAP position.

172.    According to Smith's resume as submitted for the DMAP position, her work experience included two weeks as Acting Deputy Director, National Operations, a position that she held approximately two weeks *after* the posting of the vacancy announcement for the DMAP position, starting in June 2019.  Thus, Agency officials moved Smith into this position, which is a 0341 series, just a couple of weeks after the DMAP (0341-series) position was posted.

173.    DOL was not able to produce a job description for the position of Deputy Director of National Operations, when it was requested.

174.    Smith was not qualified, because she did not establish the requisite one year of experience necessary to be an expert in the areas of organizational and human resources planning, administrative operations, communications and information technology, employee and labor management relations, and budget management, as required by the DMAP vacancy announcement.  Smith did not obtain the requisite experience in any of her positions of record.

175.    In Craig Leen's memorandum recommending Smith's selection for the DMAP position, he did not list any work history related to the required experience for the DMAP position, as it was listed in the areas of organizational and human resources planning,

administrative operations, communications and information technology, employee and labor management relations, and budget management.

176.    Smith's resume did not show any training, certifications, or education in organizational and human resources planning, administrative operations, communications and information technology, employee and labor management relations, or budget management.

177.    On November 25, 2019, Leen sent an Agency-wide email, informing all Agency employees that Smith had been selected for the DMAP position.

178.    Plaintiff Dorsey's work experience, as represented in his resume, is as follows:

   a) Deputy Regional Director - At the time of his application for the DMAP vacancy, Plaintiff Dorsey's tenure in this supervisory GS-15 position (360 series) was four-and-one-half years. While in this position, Plaintiff Dorsey was directly responsible for administering organizational and human resources planning, administrative operations, communications and information technology, employee and labor management relations, and budget management for the region. He supervised all district and division level staff, overseeing the investigation and conciliation of compliance reviews and complaint investigations pursuant to Executive Order 11246 (Title VII equivalent), Section 503 of the Rehabilitation Act (Americans with Disabilities Act equivalent) and the Vietnam Era Veterans' Readjustment Assistance Act of 1974. While in this position, Plaintiff Dorsey did obtain the one year of experience necessary to be considered an expert in the areas of organizational and human resources planning, administrative operations, communications and

information technology, employee and labor management relations, and budget management, as required by the DMAP vacancy announcement.

b) Operations Officer (Retired-Major) **-** Plaintiff Dorsey's tenure in this supervisory officer position was seven years. While in this position, Plaintiff Dorsey was directly responsible for administering personnel programs, for both military and civilian personnel, pertaining to the golf course, to lodging, to dining facilities, and to the squadron's physical fitness program. Plaintiff Dorsey also assisted the squadron commander with budget responsibilities. While in this position as well, Plaintiff Dorsey obtained the one year of experience necessary to be considered an expert in the areas of organizational and human resources planning, administrative operations, communications and information technology, employee and labor management relations, and budget management, as required by the DMAP vacancy announcement.

c) Director of Regional Program Operations **-** Plaintiff Dorsey's tenure in this supervisory GS-14 position was three years. While in this position, Plaintiff Dorsey directly oversaw the administration and processing of all the Southeast Region's compliance reviews and complaint investigations, in addition to managing GS-13 staff and below. Plaintiff Dorsey's work and accomplishments in this position thereby further provided him with the one year of experience necessary to be considered an expert in the areas of organizational and human resources planning, administrative operations, communications and information technology, employee and labor management relations, and budget management, as required by the DMAP vacancy announcement.

d)  Director of Equal Opportunity **-** Plaintiff Dorsey served in this position for ten years. While in this position, he was directly responsible for administering the Wing's Equal Opportunity Program, along with special emphasis, EO/Diversity, and the drug testing program.  Plaintiff Dorsey supervised position levels ranging from Captain and below.  He managed all personnel programs and administered the office's budget.  In this position as well, Plaintiff Dorsey obtained the one year of experience necessary to be considered an expert in the areas of organizational and human resources planning, administrative operations, communications and information technology, employee and labor management relations, and budget management, as required by the DMAP vacancy announcement.

e)  Dorsey and Associates **-** Plaintiff Dorsey's tenure in this owner position was six years.  While in this position, Plaintiff Dorsey was directly responsible for marketing, sales, labor-management, employee misconduct/EEO investigations, human resources consulting, budget administration, and HRIS installation.  Again in this position, Plaintiff Dorsey obtained the one year of experience necessary to be considered an expert in the areas of organizational and human resources planning, administrative operations, communications and information technology, employee and labor management relations, and budget management, as required by the DMAP vacancy announcement.

f)  Administrative Officer **-** Plaintiff Dorsey served in this supervisory position for two-and-one-half years.  While in this position, Plaintiff Dorsey was directly responsible for overseeing the entire operations for three different units within the law enforcement arm of the city of Las Vegas.  In this position as well, Plaintiff Dorsey

obtained the one year of experience necessary to be considered an expert in the areas of organizational and human resources planning, administrative operations, communications and information technology, employee and labor management relations, and budget management, as required by the DMAP vacancy announcement.

g) Human Resources/Diversity Officer **-** Plaintiff Dorsey's tenure in this supervisory position was six years.  While in this position, Plaintiff Dorsey was directly responsible for administering the city of Las Vegas's EEO program, Diversity Initiative, and employee relations; and he was a part of the City's negotiation team, covering four different unions.  This was yet another position in which Plaintiff Dorsey obtained the one year of experience necessary to be considered an expert in the areas of organizational and human resources planning, administrative operations, communications and information technology, employee and labor management relations, and budget management, as required by the DMAP vacancy announcement.

h) As indicated on his resume, Plaintiff Dorsey is a graduate of Northwestern University's Staff and Command program for mid-and-upper-level supervisory personnel.

i) Plaintiff Dorsey is a graduate of Federal Executive Institute, in which the courses are anchored in contemporary leadership theory.  The Institute's core curriculum is aligned with OPM's Executive Core Qualifications ("ECQ").

j) Plaintiff Dorsey is a graduate of Air Force Support Officer School, which entails manpower, budget management (appropriated/non-appropriated), equipment, facilities management, and hotel management.

k) Plaintiff Dorsey is a graduate of Defense Equal Opportunity Management Institute, which includes courses in equal opportunity, intercultural communication, as well as in religious, racial, gender, and ethnic diversity and pluralism.

**DOL/OFCCP Did Not Interview Any Qualified Black Male Applicants, Including Plaintiff Dorsey, for the Deputy Director Position; DOL/OFCPP Concomitantly Disregarded Position Rules for Other Candidates**

179.    On April 1, 2021, DOL posted a vacancy announcement for Deputy Director, ES00, with a closing date of April 30, 2021.

180.    The selectee for the position was Michelle Hodge, a Black female.

181.    Plaintiff Dorsey, in view of his vast executive experience, possessed demonstrably superior experience, skills, and qualifications as compared to Hodge.

182.    Plaintiff Dorsey applied for the position on April 30, 2021.

183.    Out of 19 original applicants for the Deputy Director position, no Black males, including Plaintiff Dorsey, were interviewed.

184.    Plaintiff Dorsey was deemed minimally qualified for the Deputy Director position.

185.    On May 18, 2021, over two weeks after the vacancy announcement closing date for the Deputy Director position, Hodge was allowed to submit her application package, based upon her claim that she had "technical difficulties."

186.     When Hodge contacted Burkley, the Talent Acquisition Branch Chief, Burkley

consulted with Adrienne Anderson (OASAM) about this issue; Burkley thereupon approved

the inclusion of this candidate's application package.

187.     In an affidavit, Anderson wrote: "****(Name removed) applicant told me she

applied on April 28, 2021. . . . She also provided me photographs from USAjobs.com

showing that she had an 'active application' for the Deputy Director job. . . .This

photograph also showed that the status of her application was 'unavailable' and instructed

her to '[c]ontact the hiring agency for an update.' . . . I was listed as the point of contact on

the vacancy announcement."

188.     During a deposition, Hodge was asked if she had applied for the Deputy Director

position.  In her response, she stated:  "I applied for the position.  I don't know the exact

date, but I applied for the position."  Further in this deposition, this Black female applicant

was asked if she had any proof that she had applied for the Deputy Director position within

the inclusive dates.  Her response was:  "Okay. I don't recall having any–I submitted the

evidence I had."

189.     The evidence mentioned by Hodge consisted of screenshots of her USAJOBS

dashboard, with a computer screen date of May 18, 2021, two weeks after the close date.

190.     According to the USAJOBS website, "Job applications are grouped into active and

archived.  Active applications are applications you're currently working on or waiting to

hear back on."

191.     Additionally, as spelled out on the Deputy Director vacancy announcement,

subsequent applications, submitted via USAJOBS, will receive in return a green

Confirmation step, noting an application was submitted successfully.

192.     Two responsible management officials named by Plaintiff Dorsey, Litras and

Patricia Davidson, each played a role in the hiring and selection processes for the Deputy

Director position.

193.     Yet another management official who played a role in the hiring and selection

process for the Deputy Director position was Milton Stewart, who was also involved in

DOL's involuntary extension of Plaintiff Dorsey's detail.

On June 1, 2021, after the closing of the Deputy Director vacancy announcement, Agency

hiring officials for the Deputy Director position scheduled a meeting with Plaintiff Dorsey's

first line supervisor, Kaiser.  The subject heading of these emails is "Deputy Director,

OFCCP-Certificate Issued-Expires June 24 2021."

**DOL/OFCCP Targeted Plaintiff Dorsey with a Lower End-of-Year Performance Rating in Retaliation for Plaintiff Dorsey's Having Complained about Discriminatory Treatment**

194.     To cause further harm to Plaintiff Dorsey's professional career, Kaiser issued an

average FY20 rating of record:  a "Fully Successful," which was inconsistent with Plaintiff

Dorsey's performance for the entire fiscal year.

195.     On April 24, 2020, Plaintiff Dorsey emailed Kaiser with a bulleted list of

accomplishments and topics for discussion for his mid-year performance review.

196.     Within this bulleted list, Plaintiff Dorsey noted that he had been the victim of

discriminatory treatment both by Kaiser and by a White female, whom Kaiser included on

the projects assigned to Plaintiff Dorsey.

197.      At the conclusion of the mid-year, Kaiser provided no indication that Plaintiff

Dorsey would receive anything other than a higher-than-average rating of record.

198.     On September 30, 2020, Kaiser requested that Plaintiff Dorsey provide a list of accomplishments for discussion and inclusion in Plaintiff Dorsey's FY20 Performance Management Plan.

199.     On October 5, 2020, Plaintiff Dorsey provided Kaiser with a two-page, bulleted list of accomplishments, ranging from designing two of the Agency's information technology projects; using JIRA and SharePoint to track project tasks, requirements and sprint completion; attending and participating in daily scrum calls; and prioritizing the backlog to develop a public outreach and education campaign with user manuals.

200.     On October 19, 2020, Kaiser issued Plaintiff Dorsey a mostly blank performance management plan, which did not include any of the accomplishments that Plaintiff Dorsey had provided.

201.     Kaiser rated Plaintiff Dorsey as "Fully Successful" for Results #1, #2, #4, and #5, and Result #3 was not rated.

202.     When Plaintiff Dorsey inquired why his ratings were so low, Kaiser implied that his hands were tied, and that he had to consult with Leen or with Davidson.

203.     In his affidavit, Kaiser provided a number of pretextual bases for issuing Plaintiff Dorsey a low rating of record, which can be easily refuted.

204.     As an example, Kaiser stated - as one of the bases for having provided Plaintiff Dorsey with a lower rating - that Plaintiff Dorsey had failed to notify him that the NCCAP project would not go live on May 4, 2020.

205.     On April 24, 2020, Plaintiff Dorsey had sent an email to Kaiser, stating: "Per my discussion with Tony this afternoon, May 4 does not look feasible at this point.  This is

mainly due to (Federal Contractor's) failure to incorporate security scans into the delivery schedule and having to refactor the integration of single sign on."

206.     On April 30, 2020, Plaintiff Dorsey emailed Kaiser a risk mitigation report for the NCCAP project, which was meant to determine "What the delays are, when did we know about the delays, and what was done to mitigate the delays."

207.     Kaiser purported to attribute the failure of the NCCAP project to "go live" to Plaintiff Dorsey, even though Plaintiff Dorsey was only a Product Owner and did not fulfill the role of either of the four project managers already assigned to the NCCAP project.

208.     One common theme that was highlighted in Kaiser's affidavits was his mention of an email communication between Plaintiff Dorsey and a White female.

209.     Kaiser falsely described Plaintiff Dorsey as "abrasive," and asserted that Plaintiff Dorsey could not get along with another Black male GS-15.

210.     Kaiser used an email exchange - as yet another basis for Plaintiff Dorsey's lower FY20 rating of record - even though the email exchange had occurred in 2018.  In said email, Plaintiff Dorsey had sought clarification on project responsibilities and established professional boundaries.

211.     Kaiser also referred to an email exchange between Plaintiff Dorsey and a GS-14 White female, in which Plaintiff Dorsey had complained of discriminatory treatment by Kaiser.  Neither the White female nor Kaiser treated Plaintiff Dorsey's complaints as protected communication/activity.  Plaintiff Dorsey up channeled this issue to Kaiser's supervisor, Davidson.

212.     Kaiser added that Plaintiff Dorsey had tried to remove this White female from her assignment by alleging hostility and discrimination when she was not even his supervisor.

Kaiser either did not understand, or purported not to understand, that the discriminatory treatment and marginalization complained of by Plaintiff Dorsey was perpetrated by Kaiser.

213.     While under obvious duress and exhaustion, Plaintiff Dorsey petitioned the second-level reviewer, Davidson, to have at least one rating changed - which was granted.

214.     According to Agency records, no non-Black male Agency employee has received an average rating for spearheading the design and development for two externally facing information technology projects.

215.     Kaiser's reasons for issuing Plaintiff Dorsey a lower rating are clearly pretextual and not supported by the evidence.

### DOL/OFCCP Required Plaintiff Dorsey to Share his Deputy Regional Director Job Responsibilities with a Black Female GS-15

216.     After returning from his involuntary detail, Plaintiff Dorsey was advised that he would have to share his duties and responsibilities with another GS-15, Marva James, a Black female.

217.     Prior to his involuntary, three-year detail, Plaintiff Dorsey had performed a wide range of duties associated with his position as Deputy Regional Director.  As the Deputy Regional Director, Plaintiff Dorsey had direct responsibility for procurement, personnel matters, labor-management, budget, training, and facilities management, and he supervised all division directors.

218.     On October 4, 2021, Plaintiff Dorsey was informed by his first-line supervisor that the region would be divided into three functions:  Operations, Infrastructure, and Outreach.

219.     Operations would involve the Division of Regional Operations and the position of Director of Regional Operations, which was a position that Plaintiff Dorsey had previously held, and at which he had excelled.

220.     Infrastructure would cover the Division of Planning and Support, which Plaintiff Dorsey had previously overseen, and concerning which Plaintiff Dorsey had extensive experience with respect to all of the Division's functions, including human resources management, facilities management, labor-management, and associated responsibilities.

221.     Outreach falls under the responsibility of the Division of Regional Compliance, which is led by a GS-14 Director, and which solely covers the region's outreach and compliance assistance efforts.

222.     Plaintiff Dorsey was advised by his first-line supervisor that his responsibilities would be relegated to Outreach; Ms. James would be responsible for Infrastructure; and Plaintiff Dorsey's first line supervisor would be responsible for Operations.

223.     In Plaintiff Dorsey's first-line supervisor's affidavit, the basis offered for Plaintiff Dorsey's being relegated to Outreach only, was that the "Region had significantly overshot its goals and was expending too many resources on outreach at the expense of the Region's operations work."

224.     After just a few weeks, Plaintiff Dorsey determined that the cause of the Region's overshooting its goals was a simple accounting issue with respect to how the outreach events were accounted for in the Agency's national office's stakeholder database.

225.     The illusion that the Region was expending too many resources on outreach, at the expense of the Region's operations, was not supported by any data or information.

226.     Numerous written communications demonstrate that James was directly involved in, among other things, personnel matters, facilities management, and training: responsibilities which would normally fall under Plaintiff Dorsey's purview.

227.     Feedback from Plaintiff Dorsey's direct reports also demonstrates that staff were confused and concerned over James's involvement in responsibilities that fell within Plaintiff Dorsey's job description.

228.     This separation of responsibilities continued until James left to report to the National Office.

229.     Agency records show that no similarly-situated non-Black Deputy Regional Director within the Agency had to share his/her position with another GS-15 employee.

**<u>DOL Reduced Plaintiff Dorsey's Bonus</u>**

230.     In 2020, DOL paid Plaintiff Dorsey a reduced bonus and, correspondingly, reduced associated benefits, while not doing the same to the other similarly-situated non-Black made Deputy Regional Directors, or to White Regional Solicitors, whose performances were less than the performance of Plaintiff Dorsey.  Plaintiff Dorsey's performance and accomplishments for DOL warranted the same bonus, commensurate with a deservedly higher rating, including Plaintiff Dorsey's performance of his duties as a detailee, and also including his performance in restructuring and revamping several major programs and initiatives.  There was no legitimate, non-discriminatory reason to pay Plaintiff Dorsey less than others who did not even perform at his level.

**Impact of the Discrimination**

231.    DOL's discriminatory actions towards Plaintiff Dorsey inflicted financial, reputational, personal, and emotional harm on him.

232.    Since 2017, Plaintiff Dorsey has been required to spend his days, evenings, and weekends compiling information; responding to affidavits, inquiries, and interrogatories; sitting for a deposition; and having to defend himself against the Agency's discriminatory actions.

233.    During the required time that Plaintiff Dorsey took to respond to the Agency's motion for summary judgment, on January 23, 2023, Plaintiff Dorsey's mother was found deceased.  Prior to this time, Plaintiff Dorsey had to deal with his mother's chronic illnesses, which resulted from a stroke and then a heart attack that his mother suffered over the course of the discriminatory actions of the DOL.

234.    Because of the excessive trauma experienced by Plaintiff Dorsey, Plaintiff Dorsey sought assistance from the Federal Occupational Health, Behavioral Health Services, Employee Assistance Program ("EAP") on January 27, 2021.

235.    Plaintiff Dorsey again sought medical health treatment on February 17, 2021, resulting in his doctor's advice that Plaintiff Dorsey be excused from work from February 17, 2021 to March 3, 2021.

236.    Plaintiff Dorsey again sought treatment from his medical provider, who in turn advised him that he should be excused from work from March 4, 2021 to March 12, 2021.

237.    Plaintiff Dorsey also sought medical health treatment from his Primary Care Physician on January 18, 2021.

238.     Plaintiff Dorsey again sought medical health treatment on March 8, 2022, and

Plaintiff Dorsey's doctor advised that Plaintiff Dorsey be excused from work from March 7,

2022 to March 11, 2022.

239.     Plaintiff Dorsey sought further medical health treatment from his doctor on January

18, 2023, resulting in the doctor's advice that Plaintiff Dorsey be excused from work from

January 17, 2023 to March 27, 2023, for further medical evaluation.  Plaintiff Dorsey was

originally diagnosed by his primary care physician as having acute stress disorder, but was

referred to Psychiatric Professionals of Georgia for further evaluation.

240.     On January 25, 2023, Plaintiff Dorsey was diagnosed as having major depressive

disorder and generalized anxiety disorder.

241.     As a business owner and entrepreneur, Plaintiff Dorsey lost business and business

opportunities as a result of having to focus fully on this case.

### Count I
**(Title VII of the Civil Rights Act of 1964 – Race Discrimination/Harassment/Hostile Work Environment)**

242.      Plaintiff adopts and incorporates by reference all allegations of this Complaint as if

fully set forth herein.

243.      Defendant's conduct, as described in this Complaint, constitutes discrimination on

the basis of race in violation of Title VII of the Civil Rights Act of 1964, as amended, and its

implementing regulations.

244.       Defendant violated the law when it subjected Plaintiff Dorsey to harassment and

discrimination with respect to an involuntary detail, as well as with respect to work

assignments, performance ratings, verbal abuse, being stripped of his duties, a Letter of

Counseling based upon unsubstantiated claims, meritless investigations, being arbitrarily removed from the DMAP applicant pool, interference with his duties, and non-selection for positions for which he was qualified, based on his race.

245.    Defendant treated Caucasian employees, and other employees who were not African-American males, more favorably than Plaintiff Dorsey.  Those African-American employees, who were selected for positions, were female, and/or had not engaged in prior protected activity, such as having filed EEO complaints.

246.    Defendant has a known history of granting preferential treatment to non-Black employees and Black females while treating Black male employees worse, and subjected Plaintiff Dorsey to this discrimination as well.

247.    DOL's discriminatory actions towards Plaintiff Dorsey have inflicted financial, reputational, personal, and emotional harm on him.

248.    In sum, Plaintiff Dorsey was exposed to disadvantageous terms or conditions of employment to which Caucasian employees and other non-African-American and Black female employees were not exposed.

249.    As a result of the intolerable working conditions and Defendant's actions, Plaintiff Dorsey has suffered economic and noneconomic damages in the past and continuing through the present.  His damages as a result of Defendant's actions are ongoing.

WHEREFORE, Plaintiff demands judgment against Defendant for equitable relief, economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than five hundred thousand dollars ($500,000.00), plus interest, fees, and costs, including reasonable attorney's fees, expert witness fees, litigation expenses, and out-of-pocket costs

incurred in connection with this action, and such other and further relief that this Honorable

Court determines just and equitable, including all available statutory and equitable relief.

### Count II
### (Title VII of the Civil Rights Act of 1964 – Gender Discrimination/Harassment/Hostile Work Environment)

250.     Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

251.     Defendant's conduct, as described in this Complaint, constitutes discrimination on the basis of gender in violation of Title VII of the Civil Rights Act of 1964, as amended, and its implementing regulations.

252.     Defendant violated the law when it subjected Plaintiff Dorsey to harassment and discrimination with respect to an involuntary detail, as well as with respect to work assignments, performance ratings, verbal abuse, being stripped of his duties, a Letter of Counseling based upon unsubstantiated claims, meritless investigations, being arbitrarily removed from the DMAP applicant pool, interference with his duties, and non-selection for positions for which he was qualified, based on his sex.

253.     Defendant treated female employees, including Black female employes, more favorably than Defendant treated Plaintiff Dorsey.  Those African-American employees, who were selected, such as Smith and Hodge, for the positions of DMAP Director and Deputy Director, respectively, were female, and/or had not engaged in prior protected activity, such as having filed EEO complaints.

254.     Defendant has a known history of granting preferential treatment both to Black female employees, and to non-Black employees, while treating Black male employees worse, and subjected Plaintiff Dorsey to this discrimination as well.

255.     DOL's discriminatory actions towards Plaintiff Dorsey have inflicted financial, reputational, personal, and emotional harm on him.

256.     In sum, Plaintiff Dorsey was exposed to disadvantageous terms or conditions of employment, to which female employees, were not exposed.

257.     As a result of the intolerable working conditions and Defendant's actions, Plaintiff Dorsey has suffered economic and noneconomic damages in the past and continuing through the present.  His damages as a result of Defendant's actions are ongoing.

WHEREFORE, Plaintiff demands judgment against Defendant for equitable relief, economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than five hundred thousand dollars ($500,000.00), plus interest, fees, and costs, including reasonable attorney's fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, and such other and further relief that this Honorable Court determines just and equitable, including all available statutory and equitable relief.

### Count III
### (Title VII of the Civil Rights Act of 1964 – Retaliation Discrimination/Harassment/Hostile Work Environment)

258.     Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

259.     Defendant's conduct, as described in this Complaint, constitutes discrimination on the basis of retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, and its implementing regulations.

260.     Defendant violated the law when it subjected Plaintiff Dorsey to harassment and discrimination with respect to an involuntary detail, and with respect to work assignments, performance ratings, verbal abuse, being stripped of his duties, a Letter of Counseling based

upon unsubstantiated claims, meritless investigations, being arbitrarily removed from the DMAP applicant pool, interference with his duties, and non-selection for positions for which he was qualified.

261.    Defendant treated employees who did not have any prior protected EEO activity more favorably than Plaintiff Dorsey.  Smith, who was considerably less qualified than Plaintiff Dorsey, was selected for the position of DMAP Director, and Hodge, who was selected for the position of Deputy Director, was also considerably less qualified than Plaintiff Dorsey.  While Plaintiff Dorsey had the requisite one year of experience in the areas of organizational and human resources planning, administrative operations, communications and information technology, employee and labor management relations, and budget management, Smith did not.  Moreover, although Plaintiff Dorsey was deemed "qualified" for the Deputy Director position, Hodge was technically, and actually, "unqualified" for the position, in that she had applied after the closing date.  Yet, Hodge was actually selected for the position.  To Plaintiff Dorsey's knowledge, neither Smith nor Hodge has a history of prior EEO activity.

262.    Plaintiff Dorsey was also subjected to retaliation when Lopez made false allegations against him, based upon his complaint; and when Maiden, against whom Plaintiff Dorsey had filed a complaint based on sexual and non-sexual harassment, was included in the decision to issue a Letter of Counseling to Plaintiff Dorsey.

263.    DOL's discriminatory actions towards Plaintiff Dorsey have inflicted financial, reputational, personal, and emotional harm on him.

264.     In sum, Plaintiff Dorsey was exposed to disadvantageous terms or conditions of employment to which employees, who had not engaged in protected activity, were not exposed.

265.     As a result of the intolerable working conditions and Defendant's actions, Plaintiff Dorsey has suffered economic and noneconomic damages in the past and continuing through the present.  His damages as a result of Defendant's actions are ongoing.

266.     WHEREFORE, Plaintiff demands judgment against Defendant for equitable relief, economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than five hundred thousand dollars ($500,000.00), plus interest, fees, and costs, including reasonable attorney's fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, and such other and further relief that this Honorable Court determines just and equitable, including all available statutory and equitable relief.

### Count IV
### (Title VII of the Civil Rights Act of 1964 – Non-selection)

267.     Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

268.     Defendant's conduct, as described in this Complaint, constitutes discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, and its implementing regulations.

269.     Defendant violated the law when it failed to select Plaintiff Dorsey for the position of Director of DMAP.  Plaintiff Dorsey, unlike Smith, the selectee for the position of Director of DMAP, had the requisite one year of experience as an expert in the areas of organizational and human resources planning, administrative operations, communications

and information technology, employee and labor management relations, and budget management.

270.    Yet, Plaintiff Dorsey was deemed not qualified for the position of Director of DMAP, and was not even granted an interview for the position.

271.    Defendant treated employees outside of Plaintiff Dorsey's protected classes more favorably than Plaintiff Dorsey.

272.    Plaintiff Dorsey was vastly more qualified for the DMAP Director position than was Smith.

273.    In sum, Plaintiff Dorsey was exposed to disadvantageous terms or conditions of employment to which employees outside of his protected classes were not exposed.

274.    As a result of the non-selection, Plaintiff Dorsey has suffered economic and noneconomic damages in the past and continuing through the present.  His damages as a result of Defendant's actions are ongoing.

275.    WHEREFORE, Plaintiff demands judgment against Defendant for equitable relief, economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than five hundred thousand dollars ($500,000.00), plus interest, fees, and costs, including reasonable attorney's fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, and such other and further relief that this Honorable Court determines just and equitable, including all available statutory and equitable relief.

## Count V
### (Title VII of the Civil Rights Act of 1964 – Non-selection)

276.    Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

277.     Defendant's conduct, as described in this Complaint, constitutes discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, and its implementing regulations.

278.     Defendant violated the law when it failed to select Plaintiff Dorsey for the position of Deputy Director.

279.     DOL violated its own regulations by allowing Hodge to apply past the deadline for the position because of purported, and unverified, "technical issues."

280.     Defendant treated employees outside of Plaintiff Dorsey's protected classes more favorably than Plaintiff Dorsey.

281.     Plaintiff Dorsey was also more qualified for the Deputy Director position than was Hodge.  Yet, not only was Plaintiff Dorsey not selected for the position.  He was not even granted an interview.

282.     Moreover, although Plaintiff Dorsey was deemed qualified for the position, Hodge was technically "unqualified," in that she had applied for the position after the closing date.

283.     In sum, Plaintiff Dorsey was exposed to disadvantageous terms or conditions of employment to which employees outside of his protected classes were not exposed.

284.     As a result of the non-selection, Plaintiff Dorsey has suffered economic and noneconomic damages in the past and continuing through the present.  His damages as a result of Defendant's actions are ongoing.

   WHEREFORE, Plaintiff demands judgment against Defendant for equitable relief, economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than five hundred thousand dollars ($500,000.00), plus interest, fees, and costs, including reasonable attorney's fees, expert witness fees, litigation expenses, and out-of-pocket

costs incurred in connection with this action, and such other and further relief that this Honorable

Court determines just and equitable, including all available statutory and equitable relief.

## JURY DEMAND

Plaintiff respectfully requests a jury trial in all claims so triable.


Respectfully submitted,


  _/s/_  **JAMES FUCHS**_____

 Dr. James Fuchs, Esq. (Bar No. 17092)
 Jason I. Weisbrot, Esq. (Bar No. 28074)
 jfuchs@sniderlaw.com
 jason@sniderlaw.com
 Snider & Associates, LLC
 Pikesville Plaza Building
 600 Reisterstown Road, 7th Floor
 Baltimore, Maryland 21208
 Phone: 410-653-9060
 Fax:  410-653-9061

## <u>CERTIFICATION OF SERVICE</u>

I certify that the aforesaid document was served by ECF on January 18, 2024.


  /s/  **JAMES FUCHS**

Dr. James Fuchs, Esq. (Bar No. 17092)
jfuchs@sniderlaw.com
Snider & Associates, LLC
Pikesville Plaza Building
600 Reisterstown Road, 7th Floor
Baltimore, Maryland 21208
Phone: 410-653-9060
 Fax:  410-653-9061