**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**GEORGE E. DORSEY, JR.**
1130 Lewis Ridge Circle
Lawrenceville, GA  30045

    *Plaintiff*

v.

**LORI CHAVEZ-DEREMER,**
**SECRETARY OF LABOR**
U.S. Department of Labor
200 Constitution Avenue, NW
Washington, DC 20210

**Case No.**    1: 24-cv-00162

Serve:
 Lori Chavez-Deremer,
Secretary of Labor
U.S. Department of Labor
200 Constitution Avenue, NW
Washington, DC  20210

Pam Bondi,
Attorney General
S           erve on:
????, Acting Assistant Attorney General for Administration and Deputy
Assistant Attorney General/Controller for the Department of Justice
U.S. Department of Justice, Justice Management Division
950 Pennsylvania Avenue NW, Room 1111
Washington, DC  20530

U.S. Attorney Matthew M. Graves
United States Attorney's Office
601 D. Street NW
Washington, DC  20004

    *Defendant*

<u>**COMPLAINT AND JURY DEMAND**</u>

COMES NOW PLAINTIFF, George E. Dorsey, Jr., by and through undersigned counsel, and files this Complaint, and sues the Defendant, and as cause states:

## PARTIES

1.     Plaintiff George E. Dorsey, Jr. resides at 1130 Lewis Ridge Center, Lawrenceville, GA 30045.

2.     Defendant Lori Chavez-Deremer, Acting Secretary of the U.S. Department of Labor, maintains a principal address at 200 Constitution Avenue, Washington, DC 20210.

## JURISDICTION AND VENUE

3.     Jurisdiction in this case is based upon 28 U.S.C. §§1331.  Venue in this case is based upon 28 U.S.C. §1343(a)(3), 28 U.S.C. §1343(a)(4) and 28 U.S.C. § 1391, in that this action involves a Defendant that is an officer or employee of the United States, acting in her official capacity or under color of legal authority, or the United States, that is located in this district. In addition, a substantial part of the events or omissions giving rise to the claims in this case occurred within this district.

4.     Plaintiff has timely complied with any conditions precedent and jurisdictional prerequisites to filing suit.

5.     Plaintiff exhausted any and all administrative remedies, including filing a formal complaint of discrimination with the Defendant Department of Labor ("DOL," the "Defendant," or the "Agency"), on February 24, 2021.  The DOL issued Plaintiff a Final

Agency Decision ("FAD") on October 23, 2023. This Complaint is being filed within 90 days of receipt of the FAD, pursuant to Title VII, 42 U.S. Code § 2000e–16(c).

### FACTS

6.      Plaintiff George E. Dorsey, Jr. ("Plaintiff Dorsey") is currently employed at the Office of Federal Contract Compliance Programs ("OFCCP") at the DOL, and he has served at the DOL since August 2010. He has served as Deputy Regional Director from 2015 to the present.

7.      Plaintiff Dorsey has excelled in his work with DOL, and has had a significant impact on the overall operations of the Agency.

8.      During Plaintiff Dorsey's first few years with the Agency, Plaintiff Dorsey introduced *prima facie* models for complaint investigations, because the Agency was not using these models to determine if discrimination had occurred.

9.       In 2014, Plaintiff Dorsey single-handedly worked with opposing counsel to conciliate a discrimination case against a major American airline, which resulted in $833,000 in back pay and 449 jobs for Black/African American and Hispanic applicants for flight attendant positions.

10.      In one year alone, in 2017, as the Director of Regional Operations, Plaintiff Dorsey worked directly with the Southeast's District Directors to conciliate discrimination cases against: (a) a major security services company, resulting in $200,000 in back wages and 16 job offers; (b) a major corporation, resulting in $86,000 in back wages and seven job offers; (c) a major sports operation resulting in $47,000 in back wages and seven job offers; and (d) another major corporation, resulting in $85,000 in back wages to two complainants.

11.    In order to create enterprise-wide efficiencies, Plaintiff Dorsey also pushed for the use of SharePoint, based on his practical experience using this tool in the military and private sector.  The Agency had not yet scaled the use of SharePoint prior to Plaintiff Dorsey's persistent efforts.

12.    As the Deputy Regional Director, Plaintiff Dorsey filled in for various positions upon the respective incumbents' departures.   Acting as the Nashville District Director, Plaintiff Dorsey was able to increase case closures by 500%; and to address several complex personnel issues, while decreasing delays in compliance review processing.

13.    Acting as the Director of Regional Compliance as an additional duty, Plaintiff Dorsey effectively transformed the division into a high-performing team.

14.    Among other achievements, Plaintiff Dorsey, by utilizing the latest technology offered by Microsoft, was able to reduce significantly the costs and time associated with the review and approval of Outreach and Compliance Assistance event requests.  Plaintiff Dorsey integrated five MS Applications, including Power Automate, PowerApps, Outlook, Teams, and SharePoint to automate this process fully from cradle to grave, thereby substantially saving labor hours and labor costs.

15.    Even while serving in an involuntary detail position that was not consistent with his career path, Plaintiff Dorsey designed, and helped to lead the development of, two of OFCCP's first major multi-million-dollar, externally facing platforms, which allow more than 500,000 federal contractors to verify the existence of their affirmative action plans ("AAPs"), or to upload their AAPs via the Affirmative Action Program Verification Interface ("AAPVI").  Plaintiff Dorsey also contributed significantly to the Agency's second externally

facing platform, which allows these same contractors to submit notifications of contract awards through the Notification of Construction Contract Award Portal ("NCAP").

16.     Plaintiff Dorsey has historically received Fully Exceeds or Outstanding ratings.

17.     In his thirteen years with DOL, Plaintiff Dorsey had never been subjected to discipline or counseling.

18.     Nonetheless, neither Plaintiff Dorsey's versatile and superior performance, nor his dedication to the Agency's mission, sufficed to protect him from discrimination and retaliation while employed at DOL.

19.     Plaintiff Dorsey is a Black male, and is the only Black male Deputy Regional Director in the entire Agency.

### Plaintiff Dorsey Engaged in Protected EEO Activity and Filed Several Complaints

20.     During the course of his employment at DOL, Plaintiff Dorsey has observed DOL engaging in widespread and systematic discrimination against Black male employees, including himself.

21.     Plaintiff Dorsey has raised such complaints within DOL and also made complaints about sexual and non-sexual harassment by his supervisor, Sam Maiden (White, male).

22.     As examples:

23.

     a.  On June 25, 2020, shortly after the George Floyd murder, Maiden forwarded an email from a White female employee to all Southeast Region staff, with the subject heading "Words of Encouragement," containing a copied quote and a story about a Beatles' song as an "added bonus." In the email, Maiden included

pictures of Paul McCartney and a story about how the song Blackbird was created. Within the story, were the words "n*gger," "b*tch," and "lynching."[1] A number of employees complained about this email. The Agency did nothing.

b. On June 30, 2020, Plaintiff Dorsey sent an email to the then OFCCP Director, Craig Leen ( White, male) and Deputy Director, Patricia Davidson ( White, female who has represented that she is Hispanic), detailing his accounts of racial hostility toward Plaintiff Dorsey and other Black employees, while also highlighting the chronic psychological and physiological damage caused by these occurrences.[2] Again, the Agency did nothing.

c. On February 11, 2021, Plaintiff Dorsey sent a 22-page memorandum, with attachments totaling 505 pages, to the newly arrived Director, Jenny Yang, and Dariely Rodriguez, Chief of Staff, detailing racial and sexual hostility that he had experienced while being employed at the Agency; and provided recommendations on how to improve the organizational culture.[3] Again, the Agency did nothing.

d. During a discussion about Plaintiff Dorsey's performance evaluation, Maiden gratuitously brought up an unrelated story about Civil War artifacts and slavery, and Maiden asserted that slavery was not about states' rights.  Plaintiff Dorsey was Issued a Letter of Counseling Based on Biased, Unfounded Complaints

---

[1] A copy of the email is attached hereto as Exhibit 1.
[2] A copy of the email is attached hereto as Exhibit 2.
[3] A copy of this memorandum is attached hereto as Exhibit 3.

16.     The Agency targeted Plaintiff Dorsey based upon specious complaints, but failed to take similar adverse actions against other similarly situated non-Black employees, including Maiden, a white employee, who was also named in some of the same and other complaints.17.     With regard to one such complaint, the Agency treated Plaintiff Dorsey disparately as to other non-Black, female employees, despite the investigator's having found that Plaintiff Dorsey had little involvement in the matter and that two other non-Black, female employees were responsible for the action  at issue in that complaint. Neither employee was subjected to discipline or similar treatment as Plaintiff Dorsey.

1.     Plaintiff Dorsey was also subjected to harassment based on biased stereotypes and racist tropes based on his voice, tone, and size.

17. In one such complaint, on September 21, 2017, Summer Jones, an Administrative Officer, named Plaintiff Dorsey as a Responsible Management Official ("RMO") in a harassment complaint based upon Plaintiff Dorsey's requests for a doctor's note for her use of sick leave, a request which Plaintiff Dorsey denied.

18. Jones also named Maiden as an RMO in this same complaint.

19. During the beginning and middle of 2017, prior to Jones's filing of her complaint, Plaintiff Dorsey had initiated a suspension action against Jones because of her repeated absences without leave during the year.  There is thus a nexus between Jones's pending discipline and the complaint that she launched against Plaintiff Dorsey.

20. During the course of the investigation of Jones's complaint, Plaintiff Dorsey was interviewed and/or had to provide affidavits, over six times, while dealing with four different investigators.

21. Maiden was never interviewed for Jones's complaint, even though he was also named as an RMO.

22. Two EEO investigations fully exonerated Plaintiff Dorsey, with respect to Jones's claims, as well as with respect to other claims that DOL attempted to attribute to Plaintiff Dorsey involving requests for reasonable accommodation.

23. More than a year after Jones had filed her complaint, and after she had left the Agency, DOL put forth specious claims against Plaintiff Dorsey regarding matters in which Plaintiff Dorsey had not been involved.

24. Among other specious claims, DOL alleged that Plaintiff Dorsey had created a SharePoint site to house "medical" information about reasonable accommodation and Family Medical Leave Act ("FMLA") requests.  DOL further alleged, again falsely, that Plaintiff Dorsey had violated the Privacy Act, because of the potential disclosure of "medical information," as opposed to Personally Identifiable Information ("PII").  DOL failed to state just what "medical information" had allegedly been disclosed.

25. DOL also alleged that Plaintiff Dorsey changed the performance ratings of two employees, but failed to name said employees.  Nonetheless, one of these employees, who was known to Plaintiff Dorsey, had her performance rating changed at Maiden's request.  Although additional evidence demonstrated Maiden's involvement, DOL wholly attributed this claim to Plaintiff Dorsey, and did not investigate Maiden.

26. Based upon a complete dearth of evidence, with respect to male employees serving under Plaintiff Dorsey, DOL narrowed its investigations concerning Plaintiff Dorsey to two additional female employees.  In one claim involving these employees, DOL alleged that

the employees felt threatened because Plaintiff Dorsey had purportedly "stopped talking" to them.

27. The EEO Contract Investigator, Dan Pierce, wrote: "The documents received indicated that the Deputy Regional Director Dorsey had little involvement in the two reasonable accommodation requests as these were mostly handled by" a White female, Assistant District Director, Nashville, Tennessee, and a Hispanic female, Assistant District Director, Miami, Florida.  These two females were not targeted by DOL for discipline.

28. DOL also alleged that Plaintiff Dorsey "abdicated" his responsibility when he stopped speaking to a direct report for three months, even though email traffic and text messages on Plaintiff Dorsey's personal cell phone, during the period in question, between Plaintiff Dorsey and this employee, clearly show otherwise.

29. DOL also made the perplexing claim that Plaintiff Dorsey did not respond to a person's emails, which resulted in the person's *ability* to meet deadlines.

30. In addition, Black female employees, including in management, targeted Plaintiff Dorsey with biased, unsubstantiated complaints, based upon racist tropes.  One such employee, Tina Williams, Director of Policy, in an affidavit dated December 18, 2018, complained that Plaintiff Dorsey's "body language and demeanor could be rather off putting and abrasive."  Williams further characterized Plaintiff Dorsey as a "large gentleman, avid athlete, and bodybuilder," with "a very loud speaking voice."  Williams also made accusations concerning Plaintiff Dorsey's interactions with other employees, but she provided no examples whatsoever.

31. Based on the specious complaints, concerning which Plaintiff Dorsey was exonerated and non-Black and female employees were named, DOL issued Plaintiff Dorsey a Letter of Counseling, on September 28, 2020.

32. Other non-Black and female employees, who were also named in some of the same and other complaints, were not investigated nor were they issued any counseling or disciplinary documents.

**Plaintiff Dorsey was Assigned to a Detail Even as DOL Refused to Investigate Plaintiff Dorsey's Complaints of Sexual and Non-Sexual Harassment Against Maiden**

33. On July 16, 2018, Plaintiff Dorsey contacted the Civil Rights Center ("CRC") EEO Counselor to file an EEO Complaint against Maiden for sexual and non-sexual harassment.

34. In Plaintiff Dorsey's written submission, he specifically named eleven employees as witnesses, in addition to a number of other employees.

35. Plaintiff Dorsey also included descriptions of alleged racial discrimination, as well as sexual and non-sexual harassment that he experienced between the period of January 2017 and July 12, 2018.

36. As remedies, Plaintiff Dorsey requested, among other things, a *"*work environment free from intimidation and harassing behavior," such as Maiden's "standing in front of me with his right hand in his pocket," which appeared as if he were "fondling himself." Plaintiff Dorsey requested new supervision and a work environment "free from offensive statements."

37. On September 14, 2018, Plaintiff Dorsey sent an email to the EEO Counselor assigned to his complaint, stating: "I do not plan on vacating my current position."

38. On September 27, 2018, Plaintiff Dorsey emailed Marika Litras (White, female), former Deputy Director of OFCCP, and detailed Maiden's discriminatory behavior, bullying, and sexual and non-sexual harassment toward Plaintiff Dorsey and other.

39. Just a few days after Plaintiff Dorsey sent his email to Litras, Litras contacted Plaintiff Dorsey to request that he serve on a detail to provide purportedly needed assistance with an information technology project.

40. When Plaintiff Dorsey informed Litras that he would like to think about it because he was not an information technology professional, Litras appeared to insist that Plaintiff Dorsey accept the detail.

41. Plaintiff Dorsey was not fully aware of the terms of the detail that Litras was pressuring him to accept, though believed it was temporary and would not exceed 120 days.

42. Plaintiff Dorsey was also not fully aware of the reason for the detail, but would come to learn over time that DOL provided several varying reasons to justify the detail, ranging from it was interim relief for Plaintiff Dorsey's harassment complaint against Maiden to he was needed on an information technology project. it was because of complaints of harassment filed against Plaintiff Dorsey.

43. In this detail, Litras placed Plaintiff Dorsey under the supervision of Javaid Kaiser (Asian, male), notwithstanding Kaiser's history of engaging in discriminatory conduct.

44. On October 30, 2018, Litras sent out an Agency-wide email, informing staff that she had asked Plaintiff Dorsey to serve on a full-time, 120-day detail, working closely with Kaiser to help the Agency's National Office launch the AAP-VI project. Litras asserted

that Plaintiff Dorsey's combined experience with IT solutions and OFCCP operations made him "uniquely suited" to assume the detail. Litras added that she wanted to Maiden for supporting the detail.

45. Although Litras alleged that the detail was consistent with Plaintiff Dorsey's professional experience, as Plaintiff Dorsey well knew, Litras knew nothing about his experience.

46. On November 16, 2018, HRC EEO Manager Betty Lopez issued Plaintiff Dorsey a non-acceptance memorandum, stating that she would not investigate Plaintiff Dorsey's claims of sexual harassment and non-sexual harassment against Maiden, on purported grounds that protected categories were not implicated.

47. In response, on November 25, 2018, Plaintiff Dorsey sent an email to Lopez, stating that he had clearly "discussed how [his] race and gender played a role in the treatment he received from Sam Maiden." and Plaintiff Dorsey asked her to provide answers to his response.

48. Because Plaintiff Dorsey had not heard back from the Agency, or from Lopez, on June 23, 2019, Plaintiff Dorsey followed up with another inquiry, and provided even greater detail with respect to his claims.

49. On July 28, 2019, Plaintiff Dorsey also inquired why other employees named by Plaintiff Dorsey as witnesses had not been contacted. Plaintiff Dorsey further asked why one of Lopez's staff members categorized the detail that he was placed in by Litras as "interim relief," given that Plaintiff Dorsey did not agree to such interim relief.

50. In an email dated August 1, 2019, Litras acknowledged having spoken to Maiden, in order to "learn the other side of the story," and then added that she had "also arranged for George [Plaintiff Dorsey] to be on a detail (for which he was a good project fit) to relieve

tension in the SE between Sam [Maiden] and [Plaintiff Dorsey]." Litras was thereby admitting to a nexus between Plaintiff Dorsey's protected communication/activity and his placement on the detail.

51. Because of DOL's refusal to investigate Plaintiff Dorsey's claims, Plaintiff Dorsey, on September 19, 2019, sent a letter to Senator David Perdue (GA), in order to push DOL to follow through with its mandated obligation to investigate his complaint.

52. Plaintiff Dorsey forwarded the letter to Leen and copied Director of Management and Administrative Programs ("DMAP"), Kelley Smith (Black, female) , who sent it to Lopez.

53. During the beginning stages of this detail, Plaintiff Dorsey learned that he would be filling the role of a non-supervisory position titled "Product Owner," whose only role is to manage the product backlog and to help communicate the vision of the project to internal stakeholders.

54. Through reading the contract for this project, Plaintiff Dorsey also learned that the Agency already assigned a federal contractor and two Agency employees to act as project managers for the Affirmative Action Program ("AAP") project.


55. Plaintiff Dorsey also began to realize he had been downgraded into a much lower level, non-supervisory position when compared to his position as the Deputy Regional Director. Plaintiff Dorsey further learned that, during this time, the Product Owner role for a comparable  agency IT project titled "Case Management System" ("CMS") was being filled by a GS-12 employee, whereas Plaintiff Dorsey was a GS-15 at the time.

56. Kaiser,  did not to know how Plaintiff Dorsey came to be assigned to the detail and was directed by Litras to accept this detail.

57. On September 28, 202, Smith issued an LOC revealing Plaintiff Dorsey's involuntary detail was actually based on unsubstantiated harassment complaints.  The DOL had previously reported this reason to Senator Perdue's office while providing Dorsey with conflicting explanations.

58. Plaintiff Dorsey timely contacted an EEO Counselor on November 10, 2020, because it was known that other similarly situated employees who had harassment allegations filed against them and who were not a Black male, were never involuntarily held in a detail for any length of time, especially for three years.

59. Despite having initially agreed, albeit reluctantly, to a detail for 120 days, the detail was subsequently extended multiple times, over objections of Plaintiff Dorsey, who subsequently served in the detail for over 3 years.

60. Agency records show that no similarly-situated non-Black employee has been moved into a detail for complaining about sexual and non-sexual harassment.

**The Investigation Determined that Maiden Had Violated the DOL's Harassment Policy, and the DOL/OFCCP Issued a Letter of Counseling**

61. Because of Plaintiff Dorsey's persistent efforts to pursue his claims, Lopez begrudgingly investigated Plaintiff Dorsey's claims of sexual and non-sexual harassment.

62. As a consequence, on November 22, 2019, Lopez issued a memorandum confirming that Maiden's behavior does not comport with the Agency's policy.

63. During the investigation, several employees confirmed the sexually harassing behavior that Plaintiff Dorsey had experienced and reported.

64. One Black female employee wrote: "Yes, I have witness[ed] Sam all the time with his hands in his front pockets and fondling himself. He does it all the time. He puts his hands in his front pockets of his pants and looks to be playing with himself." She continued: "He also stares at women's breasts. He stares at women's breasts, puts his hands in his front pockets, and fondles himself. Yes, I have reported this to management before." She further stated: "My coworker told Sam in a strong voice to move from behind her. He walked in her cubicle one time and stood behind her. I, at the time, sat across from her and I looked. Sam walked back out of her cubicle and stood at the entrance of her cubicle. Nothing else happened regarding this incident. I have talked to DRD [Plaintiff] George Dorsey about Sam's behavior. We talked about his behavior and I asked him, 'do you think he is aware of his actions?' This was probably last year sometime. I am not sure what happened. DRD Dorsey went on a Detail and we didn't even know he was leaving. Yes, I have reported it to Management before, it's been years ago. I, along with a coworker (name removed), reported his actions to Marva James, who was the then Deputy Director. She just said, 'yes, he does stare at your breasts, and he does [seem to] be doing something.' Again, nothing happened."

65. A Black male employee stated: "I have noticed on possibly 3 or 4 occasions where it would appear as if Mr. Maiden would shift himself while talking."

66. Another Black female employee wrote: "Yes, I have witnessed hi[s] placing his hands in his pockets multiple times. I had this discussion with co-workers and have asked

them: 'do you think he knows what he is doing?'  Their responses was [sic]: 'hell yeah,' and 'maybe he is just adjusting himself.'"  This employee stated that she and a coworker reported this to James, "when her job title was Deputy Regional Director back in 2008. I am not really sure what happened after the reporting."

67. On September 25, 2020, over two years after Plaintiff Dorsey submitted his complaints to Agency officials, in which he alleged sexual and non-sexual harassment, and almost one year after the Agency's EEO office concluded that Maiden's behavior did not comport with the Agency's anti-harassment policy, Maiden was issued a Letter of Counseling for violating the Agency's anti-harassment policy.

68. In this instance, according to DOL's Table of Disciplinary Offenses and Penalties, at a minimum, Maiden should have received discipline ranging from a 10-day suspension up to removal, for a first offense; a 30-day suspension up to removal for a second offense; and, for a third and/or subsequent offense, removal.

69. Subsequent to receiving the Letter of Counseling, Maiden left the Agency, but was rehired by DOL and Agency Director, Jenny Yang, on March 14, 2022, as the Regional Director for the Mid-Atlantic Region-OFCCP.

70. According to Smith's affidavit, dated December 21, 2022, Maiden was issued the Letter of Counseling, not because of the sexual and non-sexual harassment reported by Plaintiff Dorsey and other employees and detailed in the results of the investigative report, but rather because Maiden *"failed to act on the many complaints he had received concerning Mr. Dorsey's conduct."*

71. Smith thereby revealed her race and sex bias against Plaintiff Dorsey, and her need to protect Maiden by attributing the issuance of the Letter of Counseling to alleged and unsubstantiated misconduct by Plaintiff Dorsey.

### **Plaintiff Dorsey's Detail was Unilaterally Extended for Another 945 Days**

72.  After Plaintiff Dorsey had served in the detail for 120 days, Plaintiff Dorsey asked Kaiser when he could return to his position as the Deputy Regional Director.

73. DOL knew that Plaintiff Dorsey's detail was only set for 120 days and internally communicated that the detail was scheduled to end on October 7, 2019.

74. On August 30, 2019, Kaiser, unbeknownst to Plaintiff Dorsey, emailed Leen, proposing to replace Plaintiff Dorsey on the AAP-VI detail with a GS-12  White male.

75. In November 2019, Plaintiff Dorsey asked Kaiser again  and when he could return to his position of record.

76. Plaintiff Dorsey, after receiving the ROI in February 2022 and learning of a fourth reason as to why he had been placed in the detail which was for reporting sexual and non-sexual harassment by Maiden, contacted an EEO Counselor and subsequently filed, on May 2, 2022, a formal complaint, alleging retaliation for protected activity.

77. DOL rejected Plaintiff Dorsey's formal complaint on August 11, 2022, claiming that Plaintiff Dorsey was "dissatisfied with a previously filed complaint."

78. Ultimately, Plaintiff Dorsey served in the detail for more than three years.

79. On September 21, 2021, Plaintiff Dorsey was finally allowed to return  to his rightful position of record as the Deputy Regional Director of the Southeast Region.

**Plaintiff Dorsey was Not Referred Nor Selected for the Position of Director of Management and Administrative Programs ("DMAP")**

80. On May 9, 2019, DOL posted the SES-level Director of Management and Administrative Programs (DMAP) position on USAJOBS with a vacancy announcement closing date of June 10, 2019.

81. On May 15, 2019, the DMAP position was re-posted on USAJOBS, with a vacancy announcement closing date of June 15, 2019, with the statement: "new link and extended closing date."

82. On May 24, 2019, Litras sent an Agency-wide email, thanking Candice Spalding, a White female, for acting as the DMAP Director for 120 days. Litras added that "Effective Tuesday, May 28, Ken Leung [an Asian male] will serve as the Acting DMAP Director for the next 120 days."

83. On June 7, 2019, an email was sent out Agency-wide, showing the DMAP position open with a closing date of June 15, 2019.

84. On June 13, 2019, the DMAP position was re-posted again with a vacancy announcement closing date of June 24, 2019.

85. Plaintiff Dorsey applied for the DMAP position on June 24, 2019.

86. The applicant pool, identified by race and gender, including information about who was referred and interviewed for the DMAP position is as follows:

| Race/Gender | #of total applicants | # interviewed | % interviewed | % of total applicants |
|---|---|---|---|---|
| Black male | 9 | 0 | 0% | 19% |
| Black female | 14 | 8 | 57% | 30% |

| White male | 10 | 2 | 20% | 21% |
|---|---|---|---|---|
| White female | 6 | 3 | 50% | 13% |
| Hispanic male | 2 | 1 | 50% | 4% |
| Hispanic female | 3 | 2 | 66% | 6% |
| Asian male | 3 | 2 | 66% | 6% |
| Total | 47 | 18 | 38% | 100% |

87. The interview panel for the DMAP position consisted of Maiden, Litras, Joel Lovelace, and Leen.


88. On September 12, 2019, eighty days (80) after applying, Plaintiff Dorsey's application status was changed from "AR [Application Received]" to "NQ [Not Qualified]."

89. On October 18, 2019, Plaintiff Dorsey sent an email to vacancy announcement contact John Sylvia, inquiring why his application status had been changed from "Referred" to "Not Referred."

90. On October 21, 2019, Sylvia responded to Plaintiff Dorsey stating that "If the status appeared as Referred this was completed in error."

91. DOL alleged that Plaintiff Dorsey's application was deemed not minimally qualified based on a subjective review of the ECQ/MTQ responses.

92. Plaintiff Dorsey was subjected to disparate treatment with regard to the level of scrutiny placed on review of his ECQ/MTQ responses as compared to non-Black and female applicants.

93. As an example, a White employee provided the same response to two questions (which was explicitly prohibited by the job posting), yet was deemed minimally qualified and referred.

94. A White female applicant provided responses akin to a job description for her ECQs and did not give specific examples of her own experiences, accomplishments, and results, also as required by the job posting. Nonetheless she was deemed minimally qualified and selected for an interview.

95. To allow for a current Agency employee, who was a White male GS-14, to apply and interview for the DMAP position, DOL adjusted the minimum qualifications for the position to read: "You must have one year of specialized experience at a level close to the work of this job", while not specifically defining "at a level close."

96. The selectee, Smith (Black, female) was not minimally qualified for the position.

97. According to Smith's resume obtained from the ROI in February 2022, Smith was not qualified for the DMAP position, because she did not establish the requisite one year of experience necessary to be an expert in the areas of organizational and human resources planning, administrative operations, communications and information technology, employee and labor management relations, and budget management, as required by the DMAP vacancy announcement.

98. On November 25, 2019, Leen sent an Agency-wide selection email, which served as a smokescreen misrepresenting Smith's qualifications as being qualified for the DMAP position,

99. Following Smith's issuance of the September 28, 2020 LOC, Plaintiff Dorsey, having no prior direct experience with Smith, developed a reasonable suspicion regarding Smith's lack of technical and legal qualifications, triggering an inquiry into her professional background and fitness for the DMAP position.

100.    Although no posting of Smith'[s resume and credentials was readily available, Smith's defective letter provided Mr. Doprsey with a sufficient basis to begin a search to determine her credentials.  After engaging in an extensive internet search and making extensive inquiries—which he would not otherwise have had reason to do—Mr. Dorsey's reasonable suspicions were confirmed:  Smith was utterly unqualified for the position, let alone in contrast to someone with vastly superior credtials, such as Mr. Dorsey.

101.    Once this reasonable suspicion was not simply created, but confirmed, Plaintiff Dorsey timely contacted an EEO C.ounselor on November 10, 2020 for discriminatory non-selection based on race and gender.

102.    Plaintiff Dorsey's qualification, skills, and experience were demonstrably superior to that of Smith.

### Plaintiff Dorsey was Not Referred Nor Selected for the Deputy Director Position

103.    On April 1, 2021, DOL posted a vacancy announcement for the Deputy Director position, ES00, with a closing date of April 30, 2021.

104.    The selectee for the position was Michelle Hodge (Black, female).

105.    Plaintiff Dorsey, in view of his vast executive experience, was demonstrably superior to Hodge.

106.     Plaintiff Dorsey applied for the position on April 30, 2021.

107.     Out of 19 original applicants for the Deputy Director position, no Black males, including Plaintiff Dorsey, were interviewed.

108.     On May 18, 2021, over two weeks after the vacancy announcement closing date for the Deputy Director position, Hodge was allowed to submit her application package, based upon her claim that she had failed to timely file her application because she had "technical difficulties."

109.     Litras and Davidson each played a role in the hiring and selection processes for the Deputy Director position.

110.     On June 1, 2021, after the closing of the Deputy Director vacancy announcement, Agency hiring officials for the Deputy Director position scheduled a meeting with Plaintiff Dorsey's then first-line supervisor, Kaiser. The subject heading of these emails is "Deputy Director, OFCCP-Certificate Issued-Expires June 24 2021."

**Plaintiff Dorsey was Issued a Lower End-of-Year Performance Rating**

111.     Kaiser issued an average FY20 rating of record:  a "Fully Successful," which was inconsistent with Plaintiff Dorsey's performance for the entire fiscal year.

112.     On April 24, 2020, Plaintiff Dorsey emailed Kaiser with a bulleted list of accomplishments and topics for discussion for his mid-year performance review.

113.     Within this bulleted list, Plaintiff Dorsey noted that he had been the victim of discriminatory treatment both by Kaiser and by a White female, whom Kaiser included on the projects assigned to Plaintiff Dorsey.

114.      At the conclusion of the mid-year, Kaiser provided no indication that Plaintiff Dorsey would receive anything other than a higher-than-average rating of record.

115.    On October 5, 2020, at Kaiser's request, Plaintiff Dorsey provided Kaiser with a two-page, bulleted list of accomplishments.

116.    On October 19, 2020, Kaiser issued Plaintiff Dorsey a mostly blank performance management plan, which did not include any of the accomplishments that Plaintiff Dorsey had provided.

117.    Kaiser rated Plaintiff Dorsey as "Fully Successful" for Results #1, #2, #4, and #5, and Result #3 were not rated.

118.    When Plaintiff Dorsey inquired why his ratings were so low, Kaiser implied that his hands were tied, and that he had to consult with Leen or with Davidson.

119.    Kaiser's reasons for issuing Plaintiff Dorsey a lower rating are pretextual and not supported by the evidence.

### Plaintiff Dorsey was Required to Share his Deputy Regional Director Job Responsibilities with a Black Female GS-15

120.    After returning from his involuntary three-year detail, Plaintiff Dorsey was advised that he would have to share his duties and responsibilities with another GS-15, Marva James (Black, female).

121.    Prior to his involuntary three-year detail, Plaintiff Dorsey had performed a wide range of duties associated with his position as Deputy Regional Director. As the Deputy Regional Director, Plaintiff Dorsey had direct responsibility for procurement, personnel matters, labor-management, budget, training, and facilities management, and he supervised all division directors.

122.    On October 4, 2021, Plaintiff Dorsey was informed by Hodge, his first-line supervisor that the region would be divided into three functions: Operations, Infrastructure, and Outreach.

123.    Plaintiff Dorsey was advised that his responsibilities would be relegated to

Outreach, whereas James would be responsible for Infrastructure; Plaintiff Dorsey's

first-line supervisor would be responsible for Operations.


124.    Numerous written communications demonstrate that James was directly

involved in, among other things, personnel matters, facilities management, and training

- responsibilities which would normally fall under Plaintiff Dorsey's purview.

125.    Feedback from Plaintiff Dorsey's direct reports also demonstrates that staff were

confused and concerned over James's involvement in responsibilities that fell within

Plaintiff Dorsey's job description.

126.    This separation of responsibilities continued until James left to report to the

National Office.

127.    Agency records show that no similarly-situated non-Black GS-15 within the

Agency had to share his/her position with another GS-15 employee.

**Plaintiff Dorsey's Bonus was Reduced**

128.    In 2020, DOL paid Plaintiff Dorsey a reduced bonus and, correspondingly,

reduced associated benefits, while not doing the same to the other similarly-situated non-

Black male Deputy Regional Directors and White Regional Solicitors, whose job

performance and accomplishments were less than that of Plaintiff Dorsey.

129.    Plaintiff Dorsey's performance and accomplishments for DOL warranted the same

bonus, commensurate with a deservedly higher rating, including Plaintiff Dorsey's

performance of his duties as a detailee, and also including his performance in

restructuring and revamping several major programs and initiatives.

130.     There was no legitimate, non-discriminatory reason to pay Plaintiff Dorsey less

than others who did not even perform at his level.

## **Impact of the Discrimination**

131.      DOL's discriminatory actions towards Plaintiff Dorsey inflicted financial,

reputational, personal, and emotional harm.

132.     Because of the excessive trauma experienced by Plaintiff Dorsey, Plaintiff Dorsey

sought assistance from the Federal Occupational Health, Behavioral Health Services,

Employee Assistance Program ("EAP") on January 27, 2021.  Plaintiff Dorsey again

sought medical health treatment on February 17, 2021, resulting in his doctor's advice

that Plaintiff Dorsey be excused from work from February 17, 2021 to March 3, 2021;

and then from March 4, 2021 to March 12, 2021.

133.     Plaintiff Dorsey also sought medical health treatment from his Primary Care

Physician on January 18, 2021, and, again, on March 8, 2022. Plaintiff Dorsey's doctor

advised that Mr. Dorsey be excused from work from March 7, 2022, to March 11, 2022.

134.     Plaintiff Dorsey sought further medical health treatment from his doctor on

January 18, 2023, resulting in the doctor's advice that Plaintiff Dorsey be excused from

work from January 17, 2023, to March 27, 2023, for further medical evaluation. Plaintiff

Dorsey was originally diagnosed as having acute stress disorder, but on January 25, 2023,

he was diagnosed as having major depressive disorder and generalized anxiety disorder

.

### <u>Count I</u>
### (Title VII of the Civil Rights Act of 1964 – Race and Race-Plus Discrimination/Harassment/Hostile Work Environment)

135.     Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

136.     Defendant's conduct, as described in this Complaint, constitutes discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964, as amended, and its implementing regulations.

137.     Defendant violated the law when it subjected Plaintiff Dorsey to harassment, disparate treatment, retaliation, and discrimination with respect to an involuntary detail, as well as with respect to work assignments, performance ratings, verbal abuse, being stripped of his duties, a Letter of Counseling based upon unsubstantiated claims, meritless investigations, being arbitrarily removed from the DMAP applicant pool, interference with his duties, and non-selection for positions for which he was qualified, based on his race.

138.      Defendant treated  White employees, and other employees who were not African-American males, more favorably than Plaintiff Dorsey.  Those African-American employees, who were selected for positions, were female, and/or had not engaged in prior protected activity, such as having filed EEO complaints.

139.     Defendant has a known history of granting preferential treatment to non-Black employees and Black females while treating Black male employees worse, and subjected Plaintiff Dorsey to this discrimination as well.

140.    DOL's discriminatory actions toward Plaintiff Dorsey have inflicted financial, reputational, personal, and emotional harm on him.

141.    In sum, Plaintiff Dorsey was exposed to disadvantageous terms or conditions of employment to which White employees and other non-African-American and Black female employees were not exposed.

142.    As a result of the intolerable working conditions and Defendant's actions, Plaintiff Dorsey has suffered economic and noneconomic damages in the past and continuing through the present.  His damages as a result of Defendant's actions are ongoing.

WHEREFORE, Plaintiff demands judgment against Defendant for equitable relief, economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than five hundred thousand dollars ($500,000.00), plus interest, fees, and costs, including reasonable attorney's fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, and such other and further relief that this Honorable Court determines just and equitable, including all available statutory and equitable relief.

## Count II
### (Title VII of the Civil Rights Act of 1964 – Gender and Gender-Plus Discrimination/Harassment/Hostile Work Environment)

143.    Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

144.    Defendant's conduct, as described in this Complaint, constitutes discrimination on the basis of gender in violation of Title VII of the Civil Rights Act of 1964, as amended, and its implementing regulations.

145.    Defendant violated the law when it subjected Plaintiff Dorsey to harassment and discrimination with respect to an involuntary detail, as well as with respect to work

assignments, performance ratings, verbal abuse, being stripped of his duties, a Letter of

Counseling based upon unsubstantiated claims, meritless investigations, being arbitrarily

removed from the DMAP applicant pool, interference with his duties, and non-selection

for positions for which he was qualified, based on his sex.

146.     Defendant treated female employees, including Black female employes, more

favorably than Defendant treated Plaintiff Dorsey.  Those female employees, who were

selected, such as Smith and Hodge, for the positions of DMAP Director and Deputy

Director, respectively, were favored because they were female, and/or because they had

not engaged in prior protected activity, such as having filed EEO complaints.

147.      Defendant has a known history of granting preferential treatment both to Black

female employees, and to non-Black employees, while treating Black male employees

worse, and subjected Plaintiff Dorsey to this discrimination as well.

148.      DOL's discriminatory actions toward Plaintiff Dorsey have inflicted financial,

reputational, personal, and emotional harm on him.

149.      In sum, Plaintiff Dorsey was exposed to disadvantageous terms or conditions of

employment, to which female employees, were not exposed.

150.      As a result of the intolerable working conditions and Defendant's actions,

Plaintiff Dorsey has suffered economic and noneconomic damages in the past and

continuing through the present.  His damages as a result of Defendant's actions are

ongoing.

WHEREFORE, Plaintiff demands judgment against Defendant for equitable relief, economic and

noneconomic damages, including ongoing damages, in an amount to be determined at trial, but

no less than five hundred thousand dollars ($500,000.00), plus interest, fees, and costs, including

reasonable attorney's fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, and such other and further relief that this Honorable Court determines just and equitable, including all available statutory and equitable relief.

### Count III
### (Title VII of the Civil Rights Act of 1964 – Retaliation Discrimination/Harassment/Hostile Work Environment)

151.    Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

152.    Defendant's conduct, as described in this Complaint, constitutes discrimination on the basis of retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, and its implementing regulations.

153.    Defendant violated the law when it subjected Plaintiff Dorsey to harassment and discrimination with respect to an involuntary detail, and with respect to work assignments, performance ratings, verbal abuse, being stripped of his duties, a Letter of Counseling based upon unsubstantiated claims, meritless investigations, being arbitrarily removed from the DMAP applicant pool, interference with his duties, and non-selection for positions for which he was qualified.

154.    Defendant treated employees who did not have any prior protected EEO activity more favorably than Plaintiff Dorsey.

155.    Smith, who was considerably less qualified than Plaintiff Dorsey, was selected for the position of DMAP Director. While Plaintiff Dorsey had the requisite one year of experience in the areas of organizational and human resources planning, administrative operations, communications and information technology, employee and labor management relations, and budget management, Smith did not.

156.    Hodge, who was selected for the position of Deputy Director, was also considerably less qualified than Plaintiff Dorsey. Although Plaintiff Dorsey was deemed "qualified" for the Deputy Director position, Hodge was technically, and actually, "unqualified" for the position, in that she had applied after the closing date. Yet, Hodge was actually selected for the position.

157.    To Plaintiff Dorsey's knowledge, neither Smith nor Hodge has a history of prior EEO activity.

158.    Plaintiff Dorsey was also subjected to retaliation when Lopez made false allegations against him, based upon his complaint; and when Maiden, against whom Plaintiff Dorsey had filed a complaint based on sexual and non-sexual harassment, was included in the decision to issue a Letter of Counseling to Plaintiff Dorsey.

159.    DOL's discriminatory actions toward Plaintiff Dorsey have inflicted financial, reputational, personal, and emotional harm on him.

160.    In sum, Plaintiff Dorsey was exposed to disadvantageous terms or conditions of employment to which employees, who had not engaged in protected activity, were not exposed.

161.    As a result of the intolerable working conditions and Defendant's actions, Plaintiff Dorsey has suffered economic and noneconomic damages in the past and continuing through the present.  His damages as a result of Defendant's actions are ongoing.

162.    WHEREFORE, Plaintiff demands judgment against Defendant for equitable relief, economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than five hundred thousand dollars ($500,000.00), plus interest, fees, and costs, including reasonable attorney's fees, expert witness fees,

litigation expenses, and out-of-pocket costs incurred in connection with this action, and

such other and further relief that this Honorable Court determines just and equitable,

including all available statutory and equitable relief.

## Count IV
### (Title VII of the Civil Rights Act of 1964 – DMAP Non-selection)

163.    Plaintiff adopts and incorporates by reference all allegations of this Complaint as

if fully set forth herein.

164.    Defendant's conduct, as described in this Complaint, constitutes discrimination in

violation of Title VII of the Civil Rights Act of 1964, as amended, and its implementing

regulations.

165.    Defendant violated the law when it failed to select Plaintiff Dorsey for the

position of Director of DMAP. Plaintiff Dorsey, unlike Smith, the selectee for the

position of Director of DMAP, had the requisite one year of experience as an expert in

the areas of organizational and human resources planning, administrative operations,

communications and information technology, employee and labor management

relations, and budget management.

166.    Yet, Plaintiff Dorsey was deemed not qualified for, and was not even granted an

interview for, the Director of DMAP position.

167.     Defendant treated employees outside of Plaintiff Dorsey's protected classes more

favorably than Plaintiff Dorsey.

168.    Plaintiff Dorsey was more qualified for the DMAP Director position than was

Smith.

169.     In sum, Plaintiff Dorsey was exposed to disadvantageous terms or conditions of

employment to which employees outside of his protected classes were not exposed.

170.     As a result of the non-selection, Plaintiff Dorsey has suffered economic and
noneconomic damages in the past and continuing through the present.  His damages as a
result of Defendant's actions are ongoing.

171.     WHEREFORE, Plaintiff demands judgment against Defendant for equitable
relief, economic and noneconomic damages, including ongoing damages, in an amount to
be determined at trial, but no less than five hundred thousand dollars ($500,000.00), plus
interest, fees, and costs, including reasonable attorney's fees, expert witness fees,
litigation expenses, and out-of-pocket costs incurred in connection with this action, and
such other and further relief that this Honorable Court determines just and equitable,
including all available statutory and equitable relief.

172.

**Count V**
**(Title VII of the Civil Rights Act of 1964 – Deputy Director Non-selection)**

173.     Plaintiff adopts and incorporates by reference all allegations of this Complaint as
if fully set forth herein.

174.     Defendant's conduct, as described in this Complaint, constitutes discrimination in
violation of Title VII of the Civil Rights Act of 1964, as amended, and its implementing
regulations.

175.     Defendant violated the law when it failed to select Plaintiff Dorsey for the
position of Deputy Director.

176.     DOL violated its own regulations by allowing Hodge to apply past the deadline
for the position because of purported, and unverified, "technical issues."

177.      Defendant treated employees outside of Plaintiff Dorsey's protected classes more
favorably than Plaintiff Dorsey.

178.     Plaintiff Dorsey was also more qualified for the Deputy Director position than was Hodge. Yet, not only was Plaintiff Dorsey not selected for the position, he was not even granted an interview.

179.     Moreover, although Plaintiff Dorsey was deemed qualified for the position, Hodge was technically "unqualified," in that she had applied for the position after the closing date.

180.      In sum, Plaintiff Dorsey was exposed to disadvantageous terms or conditions of employment to which employees outside of his protected classes were not exposed.

181.     As a result of the non-selection, Plaintiff Dorsey has suffered economic and noneconomic damages in the past and continuing through the present.  His damages as a result of Defendant's actions are ongoing.

WHEREFORE, Plaintiff demands judgment against Defendant for equitable relief, economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than five hundred thousand dollars ($500,000.00), plus interest, fees, and costs, including reasonable attorney's fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, and such other and further relief that this Honorable Court determines just and equitable, including all available statutory and equitable relief.

## JURY DEMAND

Plaintiff respectfully requests a jury trial in all claims so triable.


Respectfully submitted,


  /s/  **JAMES FUCHS**
Dr. James Fuchs, Esq. (Bar No. 17092)

Snider & Associates, LLC
Pikesville Plaza Building
600 Reisterstown Road, 7th Floor
Baltimore, Maryland 21208
Phone: 410-653-9060
Fax:  410-653-9061
jfuchs@sniderlaw.com


  /s/ **JASON I. WEISBROT**
Jason I. Weisbrot, Esq. (MD Bar No. 28074)
Snider & Associates, LLC
600 Reisterstown Road, 7th Floor
Baltimore, Maryland 21208
Phone: 443-544-2445
Fax: 410-653-9061
jason@sniderlaw.com